Per Curiam:
This case was referred to Trial Commis-
sioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on March 20, 1969. Defendant excepted to the commissioner’s findings, opinion and recommended conclusion of law and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, with a minor deletion by the court, as hereinafter set forth, it hereby adopts the same, as modified, as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $438,263.74.
Commissioner Hogenson’s opinion, with a minor deletion by the court, is as follows:
This is a contract action based on an agreement of July 15, 1855, between plaintiff and defendant (by its Forest Service, Department of Agriculture), in which plaintiff agreed to cut and purchase timber located on the Tonga Ridge of the Snoqualmie National Forest in the State of Washington. Plaintiff’s claim is founded upon losses sustained because the volume of timber actually cut was substantially less than the quantity advertised by defendant in its prospectus for bidding and thereafter stated in the contract. While plaintiff seeks reformation of the contract, the determinative issue is whether the Forest Service in its prospectus and in the contract extended to plaintiff a warranty of quantity.
Plaintiff contends that it was entitled to rely on defendant’s representation that the volume would be 73,100 M board feet *83 of merchantable timber and that it is entitled to recover damages for loss of stumpage and for its failure to recoup road development costs, resulting from the undercutting of the timber. Defendant contends that this was a sale of a specific lot of timber, in which there was no warranty of volume, and also that the difference between the estimated or contract volume and that cut was due to plaintiff’s cutting and logging procedures, a reduction in the total area of the cutting units pursuant to plaintiff’s request, and disparity of methods used to measure the standing timber and the log volumes of the timber cut.
Plaintiff corporation of Everett, Washington, is engaged in manufacturing plywood from timber purchased as raw material. In 1952, Forest Service personnel conducted a reconnaissance of the Tonga Nidge to lay out generally the course of a road system to be used for hauling of logs in a proposed sale, but which was to become a permanent road system (except for spurs) for future forest operations, including use by the public for recreational purposes. Thei'e were only forest trails through this area. In 1953, the Forest Service 'had the right-of-way location of the main road marked on the ground by a surveying crew, and also had some of its personnel conduct a cruise of timber areas to be included in the sale, to estimate the volume of merchantable timber to be cut. The cruising lasted for 16 weeks through the summer and into the early fall of 1953. Of the 15 tracts or units later included in the contract, defendant’s estimate was that 14 cruised units would yield 60,280 M board feet, and that uncruised unit 15 had 12,820 M board feet, based on data and information obtained in the cruise of unit 6, comparable in size to unit 15, for a total of 73,100 M board feet.
Pursuant to the contract, plaintiff undertook to clear cut and purchase all dead and live merchantable timber
* * * from an area, of about 1,240 acres to be definitely designated on the ground by a Forest officer prior to cutting, in Sec. 35., T. 26 N., R. 12 E. and Sec. 1, 2, 3, 4, 8, 9, 10, 11, 15, T. 25 N., R. 12 E., W.M. within the Snoqualmie National Forest, as * * * designated on the attached map which is part of this agreement, * * *
which contract map showed as the cutting areas, in addi *84 tion to the 30-acre road right-of-way, 15 noncontiguous and irregularly shaped tracts, not described by metes and bounds or otherwise by boundary surveys within the land sections mentioned, all located within the forest extending over the Tonga Ridge.
Plaintiff also undertook to construct necessary roads as specified and at its own expense, such costs to be recouped as herein described.
The contract recited that the “estimated” amount of such merchantable timber to be cut from such tracts was:
4,100 M board feet of Douglas-fir
2.200 M board feet of Western redcedar and Alaska yellow-cedar
600 M board feet of Western white pine
66.200 M board feet of Western hemlock, Pacific silver fir and other species
A total of 73,100 M board feet, more or less, of live and dead saw timber.
These same quantities and types of timber on the subject tracts were included in defendant’s prospectus, issued by defendant on May 23,1955, and received by plaintiff on May 26, 1955, with the total volume stated to be “73,100 M board feet, more or less.” Such quantities and types were also set forth (with “more or less” stated as to each quantity) in defendant’s preliminary advertisement of sale, published on November 2,1954, in the Daily Journal of Commerce, and its three advertisements of sale published in the same newspaper on May 16 and June 14 and 30, 1955. Plaintiff was not a subscriber of that newspaper, and none of the advertisements was called to its attention.
The subject sale was on oral auction bidding, held on July 15,1955, after the various bidders had submitted sealed bids. A minimum bid stumpage rate was required for each type of timber per M board feet, called the advertised rate. Competitive bidding was on about 60 percent of each type of timber, a certain volume prescribed by the prospectus, and plaintiff’s successful bid rates became the contract rates on those quantities. On the balance of each type of timber, each bidder was required to bid the same, i.e., at the advertised rate. Of course, the bidding proceeded on the precise *85 overall volume of each, type of timber, stated in the prospectus and in the above-quoted language of the contract. For example, the competitive bidding on Douglas-fir was on 3,000 M board feet, with the uniform bidding at the advertised rate on the 1,100 M board feet balance of the contract volume of that type.
The contract contained a provision that as of July 1,1959, the Forest Service would redetermine the rate to be paid for each type of timber cut in excess of the competitive bid volume. Eate redetermination is a method devised by the Forest Service to afford relief to purchasers in cases in which the cutting of the timber will extend over several years.
In successive reappraisals in each of the years 1959 through 1967, the Forest Service consistently established the same redetermined rate for each type of subject timber. None of the redetermined rates on the various timber types is in dispute in this case.
As in the subject case, the successful bid rates (contract rates on competitive bid volumes) generally exceed the redetermined rates (effective only on quantities in excess of competitive bid volumes), because bidders tend to bid substantially in excess of the Forest Service’s original appraisal (advertised rates) in the competitive bidding, in the expectation that the redetermined rates will be substantially lower than the contract rates, thus providing overall average rates lower than the successful bid or contract rates. This was recognized by the Forest Service.
The Forest Service used the same appraisal method to establish a redetermined rate as was employed to determine the advertised rate, i.e., the market value of lumber and other products was established, from which was subtracted the overall cost of getting the standing timber through the manufacturing process. Such costs included required road development and others incident to logging operations, transportation of the logs, and manufacturing. The road costs were included, both in the original appraisal and in the reappraisals for redetermined rates in subject case, by dividing the estimated road construction cost by the estimated total volume of timber to be cut. The difference between the market value of the products and the overall costs is termed *86 the conversion return. This return is divided between the purchaser and the Forest Service, first an allowance of profit to the purchaser, with the rest being the stumpage price (plus slash disposal and reforestation fees) to be paid to the Forest Service.
With respect to road development costs, the purpose of defendant’s appraisal method was to allow plaintiff (and any other purchaser in the general application of this method) to recoup or recover its road costs by effectively reducing the price that it was to pay for each M board feet of timber cut. If the full estimated quantity of timber were cut, plaintiff would recoup its entire road costs in the nature of proportionate reductions in the price of each M board feet of timber.
In effect, the appraisal method employed by the Forest Service resulted in construction of roads by a purchaser of timber, with the Forest Service paying for such roads not with appropriated funds, but with timber. In fact, the Forest Service had no appropriated funds for the road construction involved in this case, and the use of the appraisal method was necessary.
After the Forest Service regional office had completed its plans and preparations for the proposed Tonga Ridge sale, and before the issuance of the prospectus, it was necessary to submit the proposed sale to the Chief of the Forest Service, Washington, D.C., for the consideration and approval of his office, since tlris was a sale involving more than 50,000 M board feet of timber. In addition to approving the sale, the office of the Chief suggested (but left such matters to the discretion of the regional office) that a recently approved contract form be used on the subject sale, and that in arriving at the allowance for amortization of road costs, the accelerated road amortization method be used, rather than regular road amortization. The new contract form, not employed in this case, contained the following significant provision :
Section 2b. Estimated Volumes and Rates.
1. The provisions of Sections 2a, 3a and 3b, as applied by the Forest Service, shall govern the actual quantity of merchantable timber to be cut regardless of whether it is more or less than the estimated quantities set forth *87 below and such estimates are not to be construed as guarantees or limitations of the quantities to be designated for cutting under the terms of this contract.
No comparable provision was contained in subject contract, which had no provision relating to guarantee or lack of guarantee of estimated volumes of timber.
The Acting Kegional Forester elected not to use the new contract form, because his office was then using the standard form employed in this case on all other pending sales, and he concluded that his office was not administratively prepared to adapt an individual sale to the new form. However, it is significant that the Forest Service personnel were confident that their cruise estimates were reasonably accurate, having reviewed the cruise data just two days before the auction bidding. Also, the use of accelerated road amortization could be deferred, since such provisions were applicable to quantities of timber only in excess of competitive bid volumes.
By contract amendment executed by the parties on July 17, 1959, provisions for accelerated amortization of road costs were added. In order to protect purchasers from the loss of recovery of development costs when volume estimates exceed actual cutting, the Forest Service had developed an accelerated road amortization clause, which in effect allows the purchaser to recoup its road costs against the first 80 percent cut of the contract volume. In this way, if the sale were to undercut 20 percent or less, the purchaser would be protected in that his road development costs would already have been recovered.
Accelerated road amortization rates were provided in subject case. However, they were applicable only to the quantities of timber in excess of competitive bid volumes. Consequently, only the accelerated rate pertaining to Western hemlock and related species became applicable, and then only with respect to a minor quantity.
The total volume of timber, cut or to be cut on the subject sale, amounted to 46,081 M board feet, or 27,019 M board feet less than the contract volume of 73,100 M board feet. The 46,081 M board feet were comprised of 2,843 M board feet of Douglas-fir, 1,221 of Western redcedar and Alaska yellow-cedar, 300 of Western white pine, and 41,717 of Western hem- *88 look and Pacific silver fir. Thus, the only type of timber which cut out in excess of the competitive bid volume was the Western hemlock and related species, and then only in the amount of 1,717 M board feet.
The undercutting of subject timber resulted from the inexperience of defendant’s cruisers and their failure to allow sufficient deductions for defects in the overmature and decadent stands of timber involved, and the merchantable timber recoverable under the contract thus amounted to only 46,081 M board feet, rather than the contract volume of 73,100 M board feet. The evidence is insufficient to find that the undercutting of timber in this case was caused in whole or in part by variances between cruise techniques and cutting or scaling practices, such as pertain to measurements of diameters and volumes of logs, and cutting lengths of logs as compared to log lengths used in cruising. The evidence does not establish that there was any substantial loss of timber by sinking of logs in water transportation or by breaking of logs at the water dump used by plaintiff, or by cutting practices employed by plaintiff’s logging subcontractors.
It is my conclusion that the fair and just law applicable in the instant case is that restated and adopted by the American Law Institute and the National Conference of Commissioners of Uniform State Laws in their promulgation of the Uniform Commercial Code, widely enacted in the various states.
Section 2-313 of the Uniform Commercial Code, in its Sales Article, provides as follows:
Section 2-313. Express Warranties by Affirmation, Promise, Description, Sample.
(1) Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
*89 (2) It is not necessary to the creation of an express warranty that the seller use formal words such as ‘‘warrant” or “guarantee” or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller’s opinion or commendation of the goods does not create a warranty.
The term “goods” is defined in Section 2-105 of the Code as including “growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 2-107).” Section 2-107 states that a “contract for the sale of timber * * * is a contract for the sale of goods” within the pertinent Sales Article of the Code if the timber is “to be severed by the seller.”
Since the Tonga Nidge sale contract required that the buyer, not the seller, cut the timber from the land, it might be concluded that subject contract is not within the scope of the above-quoted Section 2-313 of the Code. However, Comment 1 to Section 2-107 indicates that if the buyer is to sever the timber, the contract is deemed one affecting the land, and all problems of the Statute of Frauds and of the recording of land rights apply to it, rather than the Statute of Frauds pertaining to a contract for the sale of goods. Thus, the distinction between a timber sale contract in which the seller is to sever the timber and one in which the buyer does the cutting, is based solely upon the technical formal requirements of the Statute of Frauds relating to contracts for sale of goods, as contrasted with the one pertaining to transfers of interests in land. In the narrow context of determining the applicable law relating to the creation of warranties, there is no reason militating against the use of the above-quoted code standards in this case.
Reliance is placed upon the Uniform Commercial Code as stating applicable law for the reasons aptly stated by Circuit Judge Friendly in a case involving the issue as to whether or not a seller-manufacturer of electronic computer systems was excused from delivery of such equipment to the government. In considering the Code rule involved, Judge Friendly stated in United States v. Wegematic Corp., 360 F. 2d 674, 676 (2d Cir. 1966), as follows:
*90 We find persuasive tbe defendant’s suggestion of looking to tbe Uniform Commercial Code as a source for tbe “federal” law of sales. Tbe Code bas been adopted by Congress for tbe District of Columbia, 77 Stat. 630 (1963), bas been enacted in over forty states, and is thus well on its way to becoming a truly national 'law of commerce, which, as Judge L. PIand said of the Negotiable Instruments Law, is “more complete and more certain, than any other which can conceivably be drawn from those sources of ‘general law’ to which we were accustomed to resort in the days of Swift v. Tyson.” New York, N.H. & H.R. Co. v. Reconstruction Finance Corp., 180 F. 2d 241, 244 (2 Cir. 1950). When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to tbe total, consisting of transactions witb the United States.
* * * * *
It is concluded that a warranty of quantity of timber was extended to plaintiff by defendant in the subject contract of sale under all of the relevant facts and circumstances in evidence, based primarily on the cumulative effect of the following facts:
1. The contract prepared by defendant, its prospectus of sale, and its cruise and sale report, all available to plaintiff before bidding, all stated that there was a total of 73,100 M board feet of merchantable timber to be cut on the sale.
2. None of such documents, nor any other issued by defendant prior to the consummation of the sale, contained a disclaimer of warranty as to quantity, or any cautionary language to the effect that prospective purchasers should not rely on the defendant’s cruise estimate.
3. The suggestion was made by the office of the Chief of the Forest Service to the pertinent regional office that a new contract form be used, which clearly negated any warranty of quantity. Tbe regional office did not use tbe new form. Its personnel believed tbe cruise to be reasonably accurate.
4. The regional office also failed to implement the suggestion of the office of the Chief that accelerated road amortization provisions be included hr the contract as originally *91 prepared by defendant and executed by the parties. This is consistent with defendant’s full confidence that the total contract volume of timber would be cut, and that the regular amortization provisions were adequate, i.e., that recoupment of road costs would be fully accomplished by spreading the recovery over the entire volume of 73,100 M board feet indicated by the cruise report.
5. As required by defendant’s prospectus, the competitive bidding proceeded on certain volumes of the various types of timber, and each bidder was required to submit a uniform bid on certain additional volumes of the various types. These volumes totaled 73,100 M board feet. Thus, it is clear that defendant, as well as plaintiff, relied upon the affirmation that there were 73,100 M board feet 'of merchantable timber as “part of the basis of the bargain.”
6. It was the announced policy of the Forest Service that the determination of the timber volume to be cut from the sale areas “will be carefully made, since a prospective purchaser should reasonably expect to base his operating plans and cost estimates on such figures,” and that since the purchaser “estimates his development costs, operating costs, and returns on this estimated volume and quality” of timber 'to be cut in the sale offering, it is important “that there be good co-relation between Silvicultural prescriptions, marking guides, contract provision, appraisal and timber marking.”
7. It was a practical impossibility under the circumstances for plaintiff or any other prospective purchaser to conduct an independent cruise of the timber offered for sale, in the rugged and snow-covered terrain involved. This fact was obvious to the Forest Service, which must have assumed that plaintiff and others would have to rely upon the accuracy of defendant’s cruise. Plaintiff reasonably relied upon the accuracy of such cruise, and believed in good faith that 73,100 M board feet of merchantable timber would be cut under the contract.
8. The parties intended that all of the estimated costs of construction of the permanent road system would be recouped by plaintiff, and this could be accomplished, as the contract was originally drawn, only if the estimated volume of 73,100 M board feet was cut.
*92 This analysis and the conclusion reached are fully consistent with and supported by the rulings of this court that material representations in the government’s plans and specifications, upon which the contractor justifiably relies, in the absence of a caveat regarding verification of the facts represented, amount to a warranty, and the contractor is entitled to recover damages caused by the incorrectness of such representations, irrespective of the good faith with which they were made. In Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 699 (1964), cited with approval in Paccon, Inc. v. United States, 185 Ct. Cl. 24, 31-82, 399 F. 2d 162, 166-167 (1968), the court stated:
* * * In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue. * * *
Basically in dispute is the question of the legal effect of the words “more or less” employed by defendant in its prospectus and inserted in the contract form following the enumeration of the total volume of timber in the amount of 73,100 M board feet. In the consideration of such a technical issue, due regard must be given to the cardinal principle of contract construction that all relevant terms and circumstances of the agreement are to be considered.
In Brawley v. United States, 96 U.S. 168, 169 (1877), the Supreme Court affirmed the dismissal by this court of a claim for breach of contract, entered into by the claimant with the Quartermaster Corps, United States Army, in which claimant undertook to sell, furnish and deliver to a certain military post
* * * cut and split in lengths of four (4) feet * * * eight hundred and eighty (880) cords or * * * oak wood, more or less, as shall be determined to be necessary, by the post commander, for the regular supply, in accordance with army regulations, of the troops and employees of the garrison of said post, for the fiscal year beginning July 1, 1871, and ending June 30, 1872.* * *
*93 Forty cords of wood were delivered and paid for, after wbicli further deliveries were refused, even though claimant was fully prepared to deliver 840 cords more.
Adverting to the doctrine of sale by specific lot, the Supreme Court at pp. 171-172 stated the governing rules as follows:
Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped 'by his agent or correspondent in certain vessels, and the quantity is named with the qualification of “aoout,” or “more or less,” or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. In such cases, the governing rule is somewhat analogous to that which is applied in the description of lands, where natural boundaries and monuments control courses and distances and estimates of quantity.
But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, “about,” “more or less,” and the like, m such cases, is only for the purpose or providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weight.
The Court then held that the substance of the contract in issue was to furnish the number of cords of wood determined by the post commander in good faith for the regular supply for the fiscal year involved.
The subject sale does not fit the doctrine of sale of timber by specific lots or areas of land. It is sufficient to note that the terms of the contract in this case, and the circumstances preceding its execution, show that the defendant’s representation that the timber volume was 73,100 M board feet was the basis of the agreement between the parties, upon which representation plaintiff reasonably relied, as expected by defendant.
*94 Moreover, regarding the mention by tlie Supreme Court of land descriptions by natural boundaries, defendant’s prospectus, cruise report, contract map and contract language failed to describe the boundaries of subject cutting-areas with reasonable accuracy. In fact, the boundaries as eventually layed out, by tagging of trees by defendant prior to commencement of logging operations on each tract, varied considerably from the boundaries as indicated on the contract map. The contract map itself was far from precise, showing sketches of the irregularly shaped tracts within the land sections involved, and not involving any previous boundary surveys or tagging of trees by defendant. While geographical and physical facts were mentioned in defendant’s cruise report, which permitted a prospective purchaser to determine some boundaries of some tracts with reasonable accuracy, other 'boundaries were lost in the extension of the forest over the general area. Such designation of boundaries cannot reasonably be held to be those “independent circumstances” mentioned by the Supreme Court, which would negate a clear understanding of the parties that the 13,100 M board feet were the quantity specified as material, governing the contract.
While not cited by either party, consideration is given to the decision and opinion of this court in Brook v. United States, 84 Ct. Cl. 453 (1937), in which a timber cutting contract stated that certain estimated volumes of various types of timber were to be cut at specified rates from a 188-acre tract of land, which adjoined lands owned by plaintiff, on which he had conducted timber operations. The exact location of the contract tract was shown on a map attached to the contract. The timber estimates were based on a cruise conducted by defendant. The court applied the rule of sale by specific lot, citing and quoting from Brawley v. United States, supra.
The Brook case is clearly distinguishable from the subject case, as the facts therein show that such plaintiff was plainly not justified in relying upon defendant’s estimates as to timber volumes involved, nor does it appear that the parties intended or expected that the estimated quantities would be the basis of the agreement between them, and thus a warranty was not made by defendant in the contract. It is signifi *95 cant that the court in the Brook case recognized the applicability of the warranty principle as stated in Dunbar & Sullivan Dredging Co. v. United States, 65 Ct. Cl. 567 (1928), i.e., that a positive statement of facts in specifications, npon which the contractor is entitled to rely, is binding upon the government, and upon it rather than upon the claimant must fall the loss resulting from a misstatement of such facts. 84 Ct. Cl. at 458, 65 Ct. Cl. at 576, citing Hollerbach v. United States, 233 U.S. 165 (1914).
The effect of the failure to realize the estimated volume of timber, coupled with the rate redetermination provisions of the contract, was to increase plaintiff’s expected overall average cost per M board feet. As was anticipated by the parties, the redetermined rates were generally lower than the contract rates, and thus the average price per M board feet would have been lower than the average contract rate, had the contract volume of 73,100 M board feet been cut. "With the undercutting that occurred, plaintiff suffered damages on account of loss of stumpage, as a reasonably foreseeable result of defendant’s breach of warranty, by failing to realize the advantages of the lower average rates which would have resulted.
As to each type of timber involved herein, plaintiff’s damages for loss of stumpage are computed by first arriving at the average rate which plaintiff would have paid for each type of timber had the contract volume for that type been realized. For each type, this involves applying the contract rate to the competitive bid volume, applying the redetermined rate to the balance of the contract volume, adding the two products thus computed, and dividing such total by the contract volume, to arrive at the average rate per M board feet, which would have been paid on the contract volume. This average rate was then deducted from the contract rate actually paid, and the difference applied to the volume actually cut, to arrive at the excess payment on that type of timber, resulting from plaintiff’s failure to realize the lower average rate contemplated.
This computation was repeated with respect to each type of timber, with appropriate adjustments on the Western white pine, due to the fact that the redetermined rate ex *96 ceeded tbe contract rate, and on the Western hemlock and related species, to allow for the fact that this latter type cut out 1,717 M board feet in excess of the competitive bid volume.
Plaintiff’s damages for loss of stumpage were thus computed in the total amount of $250,046, as shown in detail in finding 36.
Defendant’s revised estimated cost of construction of the main roads was $539,600. This was the sum upon which the regular and accelerated road amortization rates were computed by defendant, and it was the intention of the parties that plaintiff would recoup this entire sum. While plaintiff’s experienced costs would appear to have been as low as $484,-750, the difference between that sum and defendant’s revised estimate was due to the fact that plaintiff negotiated a favorable subcontract on road construction. This was fully known to the Forest Service when it made the revised estimate of road cost, and it was defendant’s conclusion that plaintiff was entitled to the benefits of its favorable negotiations. Such is deemed the fair and just disposition of the matter by the court. Plaintiff recouped $351,382.26 of the estimated road costs. Accordingly, plaintiff’s damages for failure to recoup the estimated road costs amount to $188,217.74, as computed in finding 37.
It is my opinion that plaintiff is entitled to recover, and that judgment should be entered for plaintiff in the total sum of $438,263.74. •
FINDINGS op Fact
1. Plaintiff, Everett Plywood Corporation, formerly Everett Plywood and Door Corporation, is a corporation organized and existing under the laws of the State of Washington, with its principal place of 'business at Everett, Washington, engaged in the business of manufacturing various kinds of plywood from hardwood and softwood, made from timber purchased by plaintiff for its operations.
2. Plaintiff and defendant (by the Acting Regional Forester, Region 6, Forest Service, Department of Agriculture) entered into a contract (12-11-006; 32238) dated July 15, 1955, prepared by defendant, and executed by plaintiff and defendant respectively on September 16 and 30, 1955.
*97 Plaintiff thereby undertook to clear cut and purchase all dead and live merchantable timber
* * * from an area of about 1240 acres to be definitely designated on the ground by a Forest officer prior to cutting, in Sec. 35, T. 26 N., E. 12 E. and Sec. 1, 2, 3, 4, 8, 9, 10, 11, 15, T. 25 N., E. 12 E., W.M. within the Snoqualmie National Forest, as * * * designated on the attached map which is part of this agreement, * * *[1]
which contract map showed as the cutting areas, the 30acre right-of-way (included by contract language) to be cleared for the proposed main haul road, and fifteen noncontiguous and irregularly shaped tracts, not described by metes and bounds or otherwise by 'any purp orted survey within the land sections mentioned, all 'located within the forest extending over the Tonga Eidge area of defendant’s Snoqualmie National Forest in the State of Washington.
Plaintiff also undertook to construct as specified and at its own expense the road system necessary for the logging operations. No separate consideration was provided, but the cost of road construction was a factor in the bidding on the stumpage rates of the contract and in the fixing by defendant of minimum stumpage bid rates and redetermined stumpage rates, as hereinafter related.
3. The contract recited that the “estimated” amount of such merchantable timber to be cut from such tracts was 73,100,000 board feet, more or less, itemized as follows:
4,100 M board feet of Douglas-fir
2.200 M board feet of Western redcedar and Alaska yellow-cedar
600 M board feet of Western white pine
66.200 M board feet of Western hemlock, Pacific silver fir and other species
A total of 73,100 M board feet, more or less, of live and dead saw timber. In addition there is within the sale area 860 acres of pulpwood and other salvage material the taking of which shall be optional with the purchaser, *98 provided that a bid on this material at the time of the timber sale auction shall constitute agreement by the purchaser to include said material in the sale.
4. These same quantities and types of timber on the subject tracts ’(with the “more or less” qualification stated as to each type) were set forth in a preliminary advertisement placed by defendant in the Daily Journal of Commerce, Seattle, Washington, on November 2,1954, and in subsequent notices of the proposed sale, published in the same newspaper on May 16, June 14, and June 30, 1955.
The November 2, 1954, advertisement related that the timber would be offered for sale early nest summer, that information was being made available in order that prospective purchasers could examine the timber and the proposed road that fall, while the area was open and free of snow, and that road specifications and maps could be obtained from the Forest Supervisor, Seattle, Washington, or the District Ranger, Skykomish, Washington. It was stated:
* * * The sale area is at fairly high elevations and can be expected to become inaccessible within a few weeks.
The May 16 advertisement set the sale on oral auction bidding on July 11, and the two subsequent notices reset the oral bidding to commence at 2:00 p.m., July 15, 1955, at the office of the Forest Supervisor, Seattle, Washington. It was stated that to qualify for oral bidding, each bidder had to submit a sealed bid to be posted at the commencement of the auction. Each of these advertisements stated:
* * * Forest Service bid forms for use in submitting sealed bids and full information concerning the timber, the conditions of sale, and the submission of bids should be obtained from the Forest Supervisor, Seattle, Washington or the Regional Forester, Portland, Oregon before bids are submitted.
Each advertisement described the timber as located on an area embracing about 1,240 acres within certain sections of land, enumerated as set forth in the contract language quoted in finding 2.
Plaintiff was not a subscriber to the Daily Journal of Commerce, and none of the advertisements came to its attention.
*99 5. Under date of May 23, 1955, defendant issued and circulated in the State of Washington, its prospectus or notice of the proposed sale of subject timber, stated to be located on Tonga Nidge, Snoqualmie National Forest, “in parts” of certain land sections, enumerated in the prospectus as in the above-quoted contract language (finding 2), but with no statement as to the number of acres involved.
Plaintiff received a copy of the prospectus on May 26, 195'5, and later a copy of an amendment thereto, dated June 15, 1955, relating to pulpwood and salvage materials.
The prospectus stated the quantities and types of timber, as subsequently set forth in the contract (finding 3), except that the word “estimated” was not used, but as in the contract, the total volume was stated to be “73,100 M board feet, more or less,” of saw timber. No statement was made concerning guarantee or lack of guarantee of volume, or responsibility for any volume variances.[2] The prospectus and its amendment mentioned that the proposed sale was and would be advertised in the Daily Journal of Commerce on May 16, June 14, and June 30, 1955. No copy of the advertisement was included.
The prospectus outlined in general terms various conditions of the contract, and stated that it was intended as a guide, covering some of the more pertinent matters, and that before submission of bids, bid forms and full information concerning the timber, the conditions of sale and the submission of bids should be obtained from the Regional Forester, the Forest Supervisor, or the District Eanger. In a description of the various species of timber involved, it was stated that it was expected that the large old hemlock would have considerable defect.
Attached to the prospectus was a letter-size map similar to but smaller than the contract map (finding 2), showing graphically the layout of the fifteen cutting units and the road system to be constructed, sketched within certain land sections, and showing the location of the Foss Elver and various creeks in the locality.
The sale on auction bidding was set at a particular Seattle *100 location, to commence at 2:00 P.M., July 15,1955, witli sealed bids to be submitted prior to that time.
6. The subject sale of timber was commonly known as the Tonga Nidge sale. Tonga Nidge is located about 50 miles east of Seattle, Washington, in the' Cascade Mountains, and within King County, Washington, in the Skykomish District of Snoqualmie National Forest. It is rugged country, and the subject tracts are generally on steep slopes, at elevations ranging from about 3,000 to 4,800' feet above sea level. The climate is harsh and severe from mid-fall to early summer, and the growing season is relatively short.
The Tonga Nidge timber is upper zone and sub-alpine in type, mature and overmature in age. The Tonga Nidge sale involved timber generally overmature and decadent. The primary timber types were Pacific silver fir, Western hemlock, and Mountain hemlock. These species mature at approximately 120 to 150 years of age. Such trees are decadent at 200 years of age, with the rate of increase of defect in such a tree exceeding its rate of growth. Some of the silver fir trees were over 400 years of age.
7. In 1952 and 1963, timber management personnel of the Snoqualmie National Forest did the field work in the planning and preparation for the Tonga Nidge sale.
In 1952, reconnaisance was conducted by defendant in this rugged country to decide generally on the course of the necessary main haul road, taking into consideration not only the logging operations to be conducted on the proposed sale, but also the utility of the road for future use by defendant in the operation and maintenance of the forest. The road had to be located to furnish reasonable access to the tracts expected to be included in the proposed sale, and constructed with a grade and at such locations as would make its costs of construction reasonable and future maintenance practicable, with due regard to soil erosion problems.
This road had to be built from an elevation substantially below any of the tracts of the Tonga Nidge sale to elevations at the summit of the ridge, and necessarily criss-crossed the mountainous terrain to rise gradually (over fills and through cuts in some locations) to avoid excessive grades. It was recognized that substantial amounts of merchantable timber *101 would have to be removed in tbe Tonga Eidge sale to .permit the purchaser reasonably to assume the costs of construction of the road. Until the construction of the road by plaintiff, only forest trails were available throughout the Tonga Eidge area.
8. As constructed by plaintiff in accordance with contract specifications, the main road (described in finding 7) was 12.3 miles in length, designed and built to be maintained as a permanent part of the system of roads of the forest involved. Such road has been used by plaintiff to remove national forest timber (not involved in this case) from the so-called Carroll Creek sale (2,900 M board feet), located on a tract adjacent to that road. At the time of the trial of this case in 1967, such road was to be extended for a distance of 6.6 miles as part of the requirements of the so-called Tonga Deception sale of 20,000 M board feet of timber in the pertinent forest. Also, in the planning of the subject road, the Forest Service personnel took into consideration public use of the road for recreational purposes, such as hunting, fishing, camping and sightseeing, in accordance with established policy of their agency.
Under the terms of its contract, plaintiff also was required and did reconstruct 2.6 miles of the Foss Eiver road, previously inadequate for heavy truck hauling, to provide an adequate access road from the lower end of the main haul road to the public highway system. In addition, plaintiff constructed 'from the main haul road temporary spur roads (to be abandoned at the conclusion of logging operations) for hauling of the timber sold under the subject contract, and also the Tonga Eidge lateral road, leading from the main road into one of the largest of the subject tracts, unit 6. This lateral road was also designed and constructed as permanent, but of less quality than the main haul road.
9. In the summer and fall of 1953, defendant caused a crew to mark the lines of the roads by surveying, and another crew to cruise the areas to be included in the proposed sale, i.e., to estimate the quantities and types of merchantable timber •to be removed under the contract of sale. The cruising lasted for sixteen weeks, during which the crew from day to day numbered four to six men, with two men comprising a cruis *102 ing party. Each such party had a compass man and a person deemed qualified as a cruiser, with the latter compiling the data on which the estimates were made. Foggy weather, low-lying and obscuring trees above their lower branches, periodically reoccurs throughout the summer and fall on the Tonga Ridge area, and defendant’s cruisers continued to work during such periods.
The cruising continued into the fall, by which time 14 of the 15 tracts had been cruised. A new camp site would have had to be established at an elevation above 4,000 feet. The un-cruised tract, unit 15, and unit 6 were the two largest tracts, each being over 200 acres, and the data and information compiled on unit 6 were used to make the estimates on unit 15. Otherwise, the data for each cruised tract determined the estimates for that tract. The trees on unit 15 were generally older and larger than those on unit 6.
The assigned cruisers had had limited experience in the cruising of timber and no experience at altitudes above 4,000 feet, except that one cruiser had been present on another high altitude assignment in an undefined capacity, and his participation in subject cruise was on transfer from the surveying crew. Considering the rugged nature of the mountainous country over which the tracts were scattered on steep slopes, as well as the general overmaturity of the timber stands involved, and the foggy weather periodically encountered, it is concluded that the cruising crew was inadequate and not sufficiently experienced to accomplish reasonably the assigned task within the time made available and under the conditions existing and encountered.
Since winter conditions with heavy snowfall prevail on the Tonga Ridge until early summer, it is concluded under all of the circumstances that prospective purchasers (including plaintiff among others) had no reasonable opportunity to conduct a cruise of the subject timber tracts between the date of defendant’s preliminary advertisement on November 2, 1954, and the consummation of the sale on July 15,1955, or after the dates of the advertisements and issuance of the prospectus in May and June 1955 (see findings 4, 5).
10. On July 15,1955, the Tonga Ridge sale was conducted on oral auction bidding, after various bidders had duly sub *103 mitted sealed bids. Plaintiff was the high bidder in total sum of $1,247,880, and was awarded the contract as of that date.
The overall bidding was based upon the total stated quantity of each species or type of timber, as set forth by defendant in its prospectus, and such amounts corresponded with defendant’s cruise estimates and were set forth in the contract (finding 3).
Competitive bidding was only on the amounts of timber (about 60 percent of the total of 73,100 M board feet) to be cut prior to the effectiveness of the rate redetermination clause to be provided in the contract. On the competitive bidding, separate bids were made per M board feet as to each type of timber. Each such unit bid was then applied to the stated volume for that type, prescribed for bidding, and the totals of the various types added to reach the total amount of each competitive bid. Plaintiff’s overall competitive bid on the amounts of timber prescribed in defendant’s prospectus for that purpose was as follows:
Douglas-fir, 3,000 M board feet at.$25.50_$ 76, 600
Western redeedar and Alaska yeliow-cedar, 1,500 M board feet at $10.90_ 16, 360
Western white pine, 300 M board feet at $16.70_ 4, 710
Western hemlock and Pacific silver fir, 40,000 M board feet at $26.15_ 1,046,000
Pulpwood and other salvage material, 400 acres at $2.50 per acre_ 1,000
Total competitive bid- 1,144, 560
The details of this schedule, as to stumpage rates applicable to certain volumes of timber, were set forth in the contract, and such details are herein referred to by use of the terms, “competitive bid volume or volumes” and “contract rate or rates,” or like terms.
Each bidder at the auction was required to bid on the remaining timber (about 40 percent) to be purchased under the rate redetermination clause to be provided in the contract, at the advertised minimum stumpage rates, sometimes herein called advertised rates, prescribed in defendant’s prospectus. Plaintiff, as well as all other bidders, made the following bid, at the advertised rate and on the volume of each type of timber, over and above the competitive bid volumes, as follows:
*104 Douglas-fir, 1,100 M board feet at $19.20-$ 21,120
Western redcedar and Alaska yellow-eedar, 700 M board feet at $6.40_ 4,480
Western white pine, 800 M board feet at $10.70- 3,210
Western hemlock and Pacific Silver fir, 26,200 M board feet at $2.80_ 73, 360
Pulpwood and other salvage material, 460 acres at $2.50 per acre_ 1,150
Total non-competitive bid_$103,320
For convenience, the quantities or volumes set forth in this schedule are herein referred to as “quantity or quantities of timber in excess of competitive bid volume or volumes,” or like terms.
Thus, except for pulpwood and other salvage material, not to be accounted for in terms of board feet, plaintiff’s overall successful bid of $1,247,880 was based on 73,100 M board feet of timber, comprised of specific amounts of timber of each type, all as stated in defendant’s prospectus, derived from defendant’s cruise and later set forth in the contract (finding 8).
11. Under the terms of the contract, plaintiff agreed to pay for all of the subject timber scaled or felled prior to June 1, 1959, at the contract rates per M board feet, log scale. At least 45,000 M board feet (200 M board feet in excess of the volumes involved in the competitive bidding) were to be cut prior to June 1,1959, unless changed in writing by the Regional Forester.
For all other timber scaled or felled by plaintiff, plaintiff was to pay stumpage rates as established by the Chief, Forest Service, in accordance with contract provisions for redeter-mination of stumpage rates. All timber had to be cut and contract performance completed on or before December 31, 1960, unless extension of time was granted.
Successive requests by plaintiff for extensions of time have been granted by the Forest Service to March 31, 1968 with contract performance having proceeded from year to year.
12. In accordance with established practices of the Forest Service, the advertised price of each type of timber, or the minimum stumpage rate provided in the prospectus for bidding, was a stated “base price” added to the required “minimum additional bid.” For example, the prospectus stated a *105 base price of $8.50 and a minimum additional bid of $15.70 for a total of $19.20 per M board feet, the advertised rate or minimum bid price for Douglas-fir. In effect, tbe Forest Service made two appraisals, one on a long-term basis to arrive at a base price, to which was added a minimum additional price to fix the advertised rate, or minimum bid rate, at the appraised value of each type of timber as of the time of the issuance of the prospectus. This was an approved method used by the Forest Service on large sales with prolonged logging operations to permit adjustments downward (but not below a stated base price) of the sale price of timber during contract performance, notwithstanding the law prohibiting sales at less than appraised value.
13. The rate redetermination provision of the contract provided in part as follows:
Sec. 2a. The Forest Service shall before July 1,1959 redetermine the rates payable for stumpage and required deposits for the timber during the ensuing period.
Nate redeterminations shall consider the timber included in the entire sale and shall be made in accordance with the standard method in use by the Forest Service for timber appraisals, which includes consideration of the quality of the timber and analysis of operating costs and lumber and other product prices in the region in which similar operating and market conditions prevailed during such period prior to the redetermination as is sufficient to form a reasonable basis for the determination of conversion return (the difference between estimated selling values and estimated production costs exclusive of stumpage). In the determination of an equitable division of the conversion return between stumpage and margin for profit and risk for each species, species group or product, consideration also will be given to stumpage prices for comparable timber in similar transactions in the region, to general economic conditions, to market conditions and to trends in the industry.
This section of the contract further provided that such redetermined rates could not be less than certain base rates stated in the contract, varying from $1 to $3.50 per M board feet on the different types of timber, and further that any such redetermined rate which was lower than the contract rate would not be effective for the particular type of timber until the *106 contract rate had been paid on such type of timber to the extent of the competitive bid volume.
14. As provided in the Forest Service manual, the objective of rate redetermination was to arrive at a current market stumpage value as of the effective date of such redetermination, i.e., the redetermined rate should be such as would be the advertised rate at a new offering as of such effective date. The appraisal on rate redetermination (as defined in the contract langauge quoted in finding 13) was made on the same basis and in the same manner as the original appraisal which established the advertised rates, the minimum rates for bidding purposes.
As in the subject case, the successful bid rates were sometimes substantially higher than the advertised rates because bidders tend to overbid on the amounts of timber allotted for competitive bidding in the expectation that lower redetermined rates would reduce the overall average cost per M board feet of all of the timber involved in a sale. This was recognized by the Forest Service in its manual.
15. Analytical appraisals were used by the Forest Service to determine fair market value of timber both for new offers of sale and for redetermination of rates under existing contracts.
Defendant has reappraised the Tonga Bidge sale timber every year since July 1959, using the analytical method required by the contract language quoted in finding 13, i.e., estimating the selling values of products to be manufactured from the logs, and subtracting the overall costs of converting the timber into logs (including development costs), transporting the logs to a manufacturing plant, and manufacturing the products to be sold. The selling value of the products minus the costs of production is termed margin, or conversion return, which is divided between profit to the purchaser of the timber and the stumpage payment to the seller, with such stumpage payment being the redetermined rates in subject contract, with addition of minor items for slash disposal and reforestation.
The reappraised values, or redetermined rates, per M board feet, effective only on quantities in excess of competitive bid volumes, were as follows:

*107
Stumpage K.V. Slash Tota

Douglas*fir. $20.95 $1.00 $1.60 $23.45
Western redcedar and Alaska yellow-cedar— 9.15 1.00 1.50 11.65
Western white pine._-_ 14.50 1.00 1.50 17.00
Western hemlock and Pacific silver fir._«_ 7.80 1.00 1.50 10.30
These reappraisals, not in dispute in this case, took into consideration the provisions for accelerated amortization of road costs, first made applicable by contract amendment of July 1Y, 1959.
Tbe redetermined rates, set forth in the above schedule, remained constant from 1959 through 196Y through eight separate reappraisals.
16. In its original appraisal of the subject timber to arrive at the advertised rates for competitive bidding, defendant included in its estimated costs to be deducted from selling values in the analytical method of appraisal, the costs to be incurred by the successful bidder in the required construction and maintenance of the specified roads. Defendant’s engineering estimates of such costs were $565,000 for construction of the main roads and lateral road plus $36,613 for the spurs and for road maintenance, or a total of $601,613.
For the construction of the main roads, defendant allowed in its appraisal a cost of $Y.Y3 per M board feet, correctly calculated by dividing the sum of $565,000 by the expected contract volume of Y3,100 M board feet. Thus, $Y.Y3 per M board feet was the composite road amortization rate by which plaintiff would be expected to recoup its road construction costs by profitable sales or dispositions of the timber purchased from defendant in the amount of Y3,100 M board feet over the entire period of logging operations.
The Forest Service, by this usual method of providing for road construction in timber sales, was in effect paying for the roads not with funds but with timber, and thus did not require, nor did it have, appropriated funds for that purpose.
In early July 1959, prior to the accelerated road amortization amendment to the contract, defendant revised its estimate of road cost development to $539,600, and the composite road amortization rate thus became $Y.3Y per M board feet.
This revision was based upon various factors. The Foss River road and the main haul road had been constructed at a subcontract price paid by plaintiff of $450,000. In defend *108 ant’s original estimates, these two roads were estimated at $530,250. One item of such estimates was crushed rock surfacing at $116,500, whereas such item was included in the subcontract price at $80,000. This saving was due to favorable negotiation between plaintiff and its subcontractor. Another saving was because the amount of ballast estimated to be required was excessive, that being used costing $12,700, whereas defendant’s estimated quantity would have cost $38,100, or a reduction of $25,400. It was the determination of the Forest Service that plaintiff should retain the benefits of its favorable negotiations on the crushed rock surfacing, but that the saving of $25,400 on account of the overestimate of ballast should be deducted from the $530,250 estimate of cost of main road construction. Accordingly, defendant al-loted $504,850 to the main roads and added $34,750 for the lateral road yet to be constructed', for a total revised estimate of $539,600.
17. By amendment executed by both parties on July 17, 1959, the accelerated road amortization provisions of the subject contract were added.
In order to protect purchasers from the loss of recovery of development costs when volume estimates exceed actual cutting, the Forest Service developed the concept of accelerated road amortization, which in effect allows the purchaser to recoup its road costs against the first 80 percent cut of the contract volume. In this way, if the sale were to undercut anywhere up to the 20 percent of the estimated volume, the purchaser would be protected in that his road development cost would already have been recovered.
On the competitive bid volumes, the amendment stated that the amortization rates would be as follows :
Douglas-flr_$19.14
Western redcedar and Alaska yellow-cedar_ 7.50
Western white pine_ 17. 00
Western hemlock and other species_ 6.95
These rates did not provide accelerated amortization on the competitive bid volumes, as they were those set by defendant on the estimated main road costs of $565,000, and comprise the composite rate of $7.73 per M board feet, computed on the contract volume of 73,100 M board feet. These rates necessarily changed when defendant recomputed the estimated *109 main road costs at $539,600, and they became $17.64 per M board feet for Donglas-fir, $7.11 for Western redcedar and Alaska yellow-cedar, $11.69 for Western white pine, and $6.72 for Western hemlock and Pacific silver fir, for a composite rate of $7.37 on the 73,100 M board feet.
Accelerated amortization rates in the respective amounts of $31.22, $12.49, $19.72 and $11.79 were provided by the amendment on quantities of timber in excess of the competitive bid volumes.
With the exception of the $11.79 rate applicable to Western hemlock and Pacific silver fir, these accelerated road amortization rates never went into effect, because the competitive bid volumes were not otherwise realized. The $11.79 rate was only applicable to 1,717 M board feet of Western hemlock and Pacific silver fir, as hereinafter stated.
18. In the early stages of planning in 1952, defendant’s preliminary estimate of road cost was $250,000, when defendant was considering a sale of about 40,000 M board feet of timber, later increased to 50,000 M board feet, and finally to 73,100 M board feet, when defendant’s road cost estimate became $565,000. Had the volume remained at 50 M board feet, the road costs per M board feet would have amounted to $11.30 under the latter road cost estimate. In order to arrive at a realistic stumpage value for the sale, the sale volume was increased to 73,100 M board feet, by adding timber in areas accessible to the road, thus increasing the timber volume without increasing the estimated road cost.
Had the Forest Service realized that the advertised volume of 73,100 M board feet would cut out at 50,000 M board feet, or less, or in any amount substantially less than the contract volume, the proposed sale would have been withdrawn, or readvertised, with more volume added by increasing the timber areas involved. Otherwise, the proposed sale would have been unrealistic, because at 50,000 M board feet, more or less, the road amortization figure would have been so high that the stumpage value would have been very low or even negative.
19. The Tonga Ridge sale was a Chief’s sale because it involved in excess of 50,000 M board feet, and administrative regulations required submission of such a large sale to the *110 Chief of the Forest Service for his consideration and approval before issuance of the prospectus. The proposed sale and the form of the contract were reviewed in the Office of the Chief, Forest Service, Washington, D.C., and under date of April 15, 1955, that office transmitted its memorandum to the pertinent regional office, providing various instructions and also the following suggestions left to the discretion of the regional forester:
The sample contract has been prepared using the old contract form and standard contract clauses in use in Eegion 6. As this sale is scheduled to last until December 31,1960, it seems desirable to use it as a start in trying out the new contract form. It is suggested that the Eegion consider revamping the sample contract into the new form. * * * * * * * *
5. The Eegion may wish to consider either accelerated road cost amortization or the proposed method of depreciating road costs as outlined in the draft of appraisal instructions. If either of these methods are [sic] adopted for this sale it will be necessary to so provide in the sale contract. If there is doubt about the accuracy of the volume or road cost estimates it would be desirable to try out the procedure outlined in the proposed appraisal instructions.
No comparable provisions were contained in subject contract. There was no statement therein relating to guarantee or lack of guarantee of estimated volumes of timber.
20. The Acting Eegional Forester elected not to use the new contract form, Forest Service Form 202 (Eevised January 1955), but employed Form 202 (Eevised June 1942), then being used in his region. Lack of stenographic help was assigned on the regional office records as the reason why the proposed contract was not adapted to the new form, but the basic reason was the conclusion of the Acting Eegional Forester that his office was not administratively prepared to begin use of the new contract form when concurrent sales were employing the old form.
The new form set forth the following provisions, not contained in the form used on the subject sale:
Section la. Description of Area. 1. The boundaries of the sale area, and any subdivisions thereof, are as shown *111 on tbe attached sale area map, which is made a part hereof, and shall be designated on the ground by the Forest Service. Subdivisions may be revised and additional ones may be established only by written mutual agreement.
iji # * % #
Section 2b. Estimated Volumes and Eates. 1. The provisions of Sections 2a, 3a and 3b, as applied by the Forest Service, shall govern the actual quantity of merchantable timber to be cut regardless of whether it is more or less than the estimated quantities set forth below and such estimates are not to be construed as guarantees or limitations of the quantities to be designated for cutting under the terms of this contract.
21. Various provisions of subject contract, in addition to those summarized or quoted in other findings of fact, are as follows.
Sec. 2f. — Material unmerchantable for sawlogs or peeler blocks on account of defects as hereinafter defined shall be removed as a part of the salvage operation. Material unmerchantable because of size as hereinafter defined, removed other than as a part of the salvage operation, shall be paid for at the same rates as merchantable material.
$ ‡ ‡ $
Marking. — 4. Timber shall be marked or designated for cutting as follows: 15 separate cutting units covering a total of 1240 acres, more or less, including road rights-of-way, and located approximately as shown on the attached sale map, shall be designated for cutting. The boundaries of the individual cutting units shall be plainly marked and all timber within the boundaries of these units and all timber within the cleared area of the rights-of-way of all roads constructed under this agreement shall be considered as designated for cutting. 860 acres of the herein described area shall be designated for the salvage of pulpwood and other material.
*****
Merchantability. — 5. Any tree which in the judgment of the Forest Officer contains one or more logs having a total net scale of 25 percent or more of the total volume of the tree, or one or more sawlogs, merchantable as hereinafter defined, may be marked or designated for cutting as a merchantable tree.
*112 Sec. 5a — Definition of Merchantable Logs. All logs, including Western redcedar chunks and slabs, are merchantable under the terms of this agreement which scale at least 33y3 percent of their gross scale, contain not less than 50 board feet of net volume, and equal or exceed at least one of the following length and diameter measurement combinations: length 12 feet, diameter not less than 12 inches; length 16 feet, diameter not less than 10 inches; length 26 feet, diameter not less than 8 inches. Diameters shall be the average measurement inside bark at small end for logs and the minimum end measurement for cedar chunks and slabs.
Any Douglas-fir log unmerchantable under the above definition which by rebucking will produce a block or short log that will grade not lower than a Number 3 peeler in accordance with the official Log Scaling and Grading Eules of the Puget Sound Log Scaling and Grading Bureau shall be merchantable for that portion of the log which meets these specifications and is not less than 8 feet long, exclusive of trim allowance, and not less than 24 inches in diameter inside the bark at the small end: Provided, That no such block or short log of this species scaling less than 140 board feet net scale shall be considered merchantable.
•I» H* *í*
Scaling. Sec. 6. The title to all timber included in this agreement shall remain in the United States until it has been paid for, felled and scaled, measured, or counted.
Saw logs shall be scaled by the Scribner Decimal G log rule, at the small end on the average diameter inside bark taken to the nearest inch.
In the discretion of the forest supervisor, the volume of each marked or designated tree may be determined and recorded, before felling, in accordance with the volume tables listed below, copies of which are filed in the office of the forest supervisor, with such allowance for defect as the forest supervisor may determine to be equitable for the timber on this sale area: Girard Form Class Volume Tables for 32-foot Logs.
:Js # # #
Sec. 7 — Maximum Scaling Length. The maximum scaling length of saw logs shall be 40 feet; greater lengths shall be scaled as two or more logs. Upon pon-derosa pine, sugar pine, white pine, and knobcone pine logs which are 16 feet or less in length, not less than *113 4 inches or more than 8 inches shall be allowed for trimming. Upon such logs 17 feet to 34 feet, inclusive, in length, not less than 8 inches or more than 12 inches shall be allowed for trimming, and upon such logs 36 feet and longer, not less than 12 inches or more than 16 inches shall be allowed. Upon logs of all other species, which are 40 feet or less in length, not less than 8 inches or more than 12 inches shall be allowed for trimming. Upon all logs over 40 feet in length, an additional 2 inches shall be allowed for each 10 feet in length or fraction thereof in excess of 40 feet. Logs overrunning the specified trimming allowance shall be scaled not to exceed the next standard two foot scaling measure in length. Logs which are cut in the peeler length of 17 feet, plus trim, shall be scaled as 17 foot logs.
* :!« * * *
Sec. 7a — Bureau Scaling. By mutual agreement in writing between the purchaser and the forest supervisor the scale of saw logs may be determined by a designated scaling bureau, in which event saw logs shall be scaled in accordance with the scaling bureau’s rules of scaling: Provided, That the Forest Service reserves the right to check scale the work of scaling bureau scalers and when such check scales show a variance in scale in excess of plus or minus 5%, the Forest Service will request the designated scaling bureau to make a re-scale if logs are being scaled in assembled rafts or a check scale in all other cases; the parties agree to accept the bureau’s re-scale volume as the final volume for such raft or rafts, whenever the bureau’s re-scale volume shows a variance in excess of plus or minus 5%.
Determination of scale by the bureau may be for all or part of timber cut and may be terminated by the forest supervisor whenever services rendered are deemed unsatisfactory, or by the purchaser at any time after thirty days’ notice in writing to the supervisor.
During the period agreement to use bureau scaling is in force scaling shall be performed at places acceptable to the bureau and the forest officer in charge; all logs shall be branded and painted with highway yellow paint or otherwise plainly marked in such manner as directed by the forest officer for easy identification and shall not be removed from the place agreed upon for scaling until scaling has been completed. The purchaser agrees to cooperate with the forest supervisor in providing conditions satisfactory for making check scales by a Forest Service check scaler, and to hold designated *114 rafts containing national forest logs for re-scaling or check scaling by the bureau whenever a Forest Service scale of said raft indicates a variance in excess of 5% from the original bureau scale. Any log brand assigned to logs from this sale area will not be used on logs from any other sale area or on logs from any area in other ownership until such brand has been released in writing by the forest supervisor. Methods customarily employed by the bureau may be used to signify completion of scaling in lieu of stamping by a forest officer.
‡ ‡ ‡
41. Complaints by the purchaser as to any action taken by a Forest Officer respecting this agreement shall not be considered unless made in writing within.thirty (30) days of such action to the Forest Supervisor having jurisdiction. The decision of the Secretary of Agriculture shall be final in the interpretation of the regulations and provisions governing the sale, cutting, and removal of the timber covered by this agreement.
22. Cruising of timber for the purpose of sale or purchase is a matter of estimating and measuring standing trees to reach a reasonably accurate estimate of the net volume of merchantable logs which will be produced from that stand of trees. Experience is quite important to a cruiser to estimate the quantity of defect, hidden or manifested by external indicators, and amount of breakage that will occur in the felling of trees, for which deductions must be made to estimate the volume of merchantable timber.
The ultimate test of cruising is whether the cruised timber cuts out to produce a volume of scaled logs equivalent to the cruise volume. As recognized by the Forest Service and the timber industry in the pertinent forest region, the standard of accuracy is that an acceptable cruise will cut out within ten percent plus or minus of the cruise volume. Of course, variations between cruising techniques and logging and scaling practices could produce wider differences between cruised and scaled volumes.
A 100 percent enumeration, or measurement of all trees in an area, is seldom done, as it is time-consuming and expensive, and because human error factors tend to be accentuated by such a procedure. Sampling of the entire area by measurements of all trees within spaced units has proven to *115 be more accurate. The sampling method was employed 'by defendant’s cruisers of the Tonga Nidge timber, and also in the cruise conducted for plaintiff of unit 15 in 1966. In each area cruised, trees were measured and estimated in sample plots spaced throughout such area, and a determination made as to the volume of each type of timber in the entire area by use of the data and information obtained from the sample plots. Defendant’s cruising was on a 4 x 4 chain spacing, i/5 acre circular plots basis, every fourth plot log graded in 82-foot logs. This was a relatively high intensity of cruise, employed because of recognition of the high development costs involved on the proposed sale, with risk being greater than usual. Form class volume tables for 82-foot logs were used in the volume computations.
Plaintiff’s expert witness on timber cruising conceded that defendant’s method of cruising was basically sound and should have produced reasonably accurate volume estimates, and concluded that the large deficiencies of volume of merchantable timber realized in the logging of subject tracts resulted from the inexperience of defendant’s cruisers and their failure to allow sufficient deductions for defects, hidden or manifested by external indicators, in the overmature stands of timber involved.
In its Forest Service Handbook, extant during the preparation for and consummation of subject sale, defendant recognized that the determination of the timber volume to be cut from the sale areas “will be carefully made, since a prospective purchaser should reasonably expect to base his operating plans and cost estimates on such figures,” and that since the purchaser “estimates his development costs, operating costs, and returns on this estimated volume and quality” of timber to be cut in the sale offering, it is important “that there be good co-relation between Silvicultural prescriptions, marking guides, contract provisions, appraisal and timber marking.”
23. Defendant’s cruise estimates amounted to 60,280 M board feet on the 14 tracts cruised and the main haul road right-of-way, with 12,820 M board' feet assigned to uncruised unit 15 on the basis of unit 6 data and information, for a *116 total estimated volume of 73,100 M board feet of merchantable timber.
24. As conceded in the testimony of defendant’s Acting Regional Forester who executed subject contract for defendant, and who served as the Assistant Regional Forester from 1949 until his retirement at the end of 1965, Forest Service sales in his region preponderantly overcut defendant’s cruised volumes in the years preceding the consummation of the Tonga Ridge sale, although there was a considerable number of sales that undercut.[3] Relatively, the undercutting was small in proportion to the volumes cut. It was generally known in the timber industry in the pertinent region that Forest Service sales frequently overcut, and plaintiff’s timber manager and assistant timber manager were cognizant of this fact, and had had experience with prior sales of Forest Service timber, in which there had been overruns.
Audit reports of the General Accounting Office in 1957 and 1958 of Forest Service sales of timber in the pertinent region in the years 1950-1955, established that in a preponderance of such sales, the purchasers actually cut more timber than was stated in Forest Service cruises, and that of 36 large sales completed in 1955, there was an overall overcut of 19 percent in excess of the region’s estimated volume, with ten of such sales undercutting and 26 of them overcutting.
25. In the sampling process used in cruising, it is recognized that the ideal objective is to arrive at an average volume of merchantable timber on a certain portion of the entire tree population, which is a completely accurate average of the entire tree stand. Inherent errors in the sampling process, i.e., the difficulties of selecting truly representative sample plots in a variable population, as well as the exercise of judgment as to the size and extent of the sample of the overall population, result in a sampling error, which can be calculated from the data and information obtained in the sample. The sampling error has nothing to do with the human errors which may occur in measurements taken in the sample. Human errors could occur in the measurement of the area of *117 a sample plot, the log heights and diameters of trees, and ascertainment and allowances for defects and possible breakage of trees, which human errors can only be avoided by adequate training and experience of cruisers, and by check cruising of the work of the cruisers.
In the Tonga Eidge cruise, defendant’s cruisers measured trees in 519 separate sample plots, each 1/5 of an acre. The average plot volume was 12.54 M board' feet. As would be expected, the volume for individual plots varied from the average. This variance between individual plots is expressed in terms of “coefficient of variation,” being a summarization of deviation from the mean, converted in terms of percentages, the percentage being calculated by dividing the deviation from the mean by the mean itself.
The “standard error” in sampling is the measure of accuracy to be attained in the cruise, set prior to the cruise. The Forest Service had tables used in timber sale preparation for determining the standard error of a cruise. The higher the development cost, the less standard error was acceptable. In the Tonga Eidge sale, the standard error used was 2.23 percent, which meant that it was intended that the cruise error would be within 2.23 percent at the so-called 66 percent confidence level (2 times out of 3) or within 4.46 percent at the 95 percent confidence level (19 times out of 20) in accordance with axioms of statistical method.
In its Tonga Eidge sale report, defendant stated that the standard error of 2.23 percent was slightly higher than would be admissible under the tables in making the cruise, because the number of plots taken was “a little too low,” but that this was offset by the addition of 200 acres (unit 15) to the proposed sale after completion of the cruise.
With the standard of error stated, and after determination of the coefficient of variation from a preliminary light sampling, competent cruisers can determine the number of plots necessary to predict the total population within the accuracy limit prescribed. Competent cruisers keep human error within the same limit as the sampling error.
Defendant’s cruise was of sufficient intensity so that the sampling error would conform with the standard error prescribed of 2.23 percent.
*118 26. Plaintiff’s assistant timber manager was aware that Forest Service employees were active in 1953 and 1954 in tbe Tonga Ridge area, making preparations for a future sale of timber. During tbe late summer or early fall of 1954, tbe Skybomisb District Ranger told bim that tbe Tonga Ridge sale would be beld sometime in 1955, and that if interested, plaintiff should look at tbe timber because tbe sale might be beld prior to tbe melt-off of snow. He examined the general area and its timber stands in 1954 before tbe first snowfall. In tbe spring of 1955, be mspected timber in tbe general area on occasions. Prior to July 1955, be traveled on foot through the entire Tonga Ridge area on two occasions, staying overnight, as more than a full day was required to bike through tbe area. He examined tbe quality of tbe timber and tbe terrain and physical conditions as they pertained to tbe proposed road construction. He made no attempt to cruise the timber for quantity. He observed that some of tbe trees were defective, seeing dead tops on some hemlocks and white fir, indicating to bim over-ripe trees. He bad intermittent contacts with the District Ranger, and a copy of tbe contract map was provided to bim. Their discussions are not detailed in evidence.
After receipt by plaintiff of defendant’s prospectus on May 26, 1955, plaintiff’s timber manager obtained a copy of defendant’s cruise report from tbe Skybomisb District Ranger. Sometime during tbe month of June or the first week in July 1955, he inspected timber in tbe western portion of tbe Tonga Ridge area. Pie also received reports from bis assistant timber manager as to findings and observations on tbe entire area.
27. Plaintiff’s timber manager bad had many years of experience with Forest Service sales, in which he bad observed that overruns were common, i.e., the actual volume of logs produced exceeded tbe volume stated in tbe contract of sale, and that an occasional underrun was tbe exception rather .than the norm.
28. At a meeting of plaintiff’s 'board of directors beld sometime prior to tbe auction bidding in 1955, plaintiff’s general manager and its timber manager presented defendant’s prospectus to tbe board. Plaintiff’s timber manager *119 advised tlie board that he expected that the subject timber would cut out about 10 percent in excess of the 73,100 M board feet stated in the prospectus, or in a volume of about 80,410 M board feet.
Eelying upon the recommendations and advice of plaintiff’s general manager and its timber manager, and upon the accuracy of the timber volumes stated in defendant’s prospectus, and with the belief that 73,100 M board feet or more would be cut out from the timber involved, the board authorized the .submission of a bid and participation in the auction bidding. Under date of July 14, 1955, the day before the subject auction bidding, plaintiff’s general manager circulated among plaintiff’s shareholders a suggested plan for creation of a revolving fund for acquisition of timber, listing various proposed sales, among which was the Tonga Eidge sale, concerning which he stated that 80,000 M board feet were involved.
29. The Tonga Eidge sale included the road right-of-way and 15 units of timber, all sold for clear cutting. Prior to the sale, the boundaries of each unit were not marked on the ground, nor was the perimeter surveyed by metes and bounds, nor was the perimeter marked by the method of tagging of trees.[4] After the sale, the boundaries of each unit were marked by defendant by tagging of trees prior to the commencement of logging on such unit. Such tagging was not completed on some units until 1961, although no delay in logging operations was thereby caused. Before such marking, plaintiff could not determine the boundaries of each tract with reasonable accuracy, either from defendant’s sale and cruise reports, the prospectus, the contract map, or other documents available for plaintiff’s inspection.
Among the available documents were aerial photos of the Tonga Eidge area, with boundaries of units 5 through 13 sketched thereon, providing only the general location of such units, but not the boundaries within any substantial degree of accuracy. Defendant’s cruise of most tracts was tied into the surveyed road location, and the points at which *120 some of the tracts intersected the road location were marked on the ground before the sale was made. Also, one or more sides of most tracts could be located with respect to geographical or physical facts, such as creeks, ridge tops, and burned out or previously logged areas, but one or more sides of most tracts were undefined in the extension of the forest over the general area.
Defendant’s cruise plot centers were marked on the ground, but the cruisers knew only the probable areas to be included in the sale, and they cruised timber outside of what later became the cutting units. This procedure was employed to afford flexibility in accomplishment of the proposed sale. Also, snow coverage would have made the finding of plot center markings extremely difficult in the period of time between issuance of the prospectus and the date of the sale, even though a tree near each plot center mark was appropriately tagged by defendant.
30. After the completion of the marking of the units in 1961, the Forest Service prepared a new map showing the unit boundaries as laid out on the ground. The location and size of 14 of the 15 cutting units had been changed from those shown on the contract map and in the sale report. The area of each of seven separate omits had been increased 4,17, 9, 43, 9,15 and 80 acres respectively, for a total of 177 acres. The area of each of seven other units had been decreased 3, 26, 43, 6, 2, 8, and 3 acres respectively, for a total decrease of 91 acres.
Besides having the above-itemized increase of 80 acres, unit 15 had the greatest change in location, moving about a thousand feet in one direction, with a substantial change in shape, becoming two disjointed parcels, rather than one complete area as drawn on the contract map.
In 1963, plaintiff learned of the Forest Service’s new map. By letter dated December 3,1963, plaintiff complained to the District Banger about addition of acreage to units. By projecting its experience of undercutting of cruised volumes on various tracts to that date, plaintiff believed that its cut out volume on the entire sale would not reach the competitive bid volume even with the added acreage, and that addition of *121 such acreages would only increase the losses expected on overall performance.
In December 1963, plaintiff’s representatives met with the Acting Regional Forester and his staff at Portland, Oregon. Plaintiff then believed that its cut out volume of the contract timber would amount to 44,600 M board feet, and defendant’s projected estimate was that such figure would be about 50,000 M board feet. Plaintiff requested that additional timber be added to raise cut out volume to the 73,100 M board feet stated in the contract, but the Acting Regional Forester stated that no such administrative relief could be granted.[5] Plaintiff then requested relief from the increased acreages resulting from the marking of the boundaries of the tracts.
Five tracts then remained to be cut. Reduction of acreage was made by defendant as follows: Unit 8 was reduced from the 1961 acreage of 103 acres to the original acreage of 60 acres, and unit 15 was reduced to 250 acres from the 1961 amount of 300 acres, with the original having been 220 acres. In the meantime, unit 13 (originally 30 acres reduced to 22 acres in 1961) had been deleted. With these adjustments, the acreage of the tracts (and the acreage of the road right-of-way) cut or to be cut amounted to 1,229 acres, increased to 1,238 acres, because plaintiff removed and paid for timber under the contract from a 9-acre tract of blowndown timber adjacent to unit 6, in exchange for unit 13, as agreed by the parties. Thus, the final acreage determination was 2 acres less than the contract amount of 1,240 acres.
31. The land sections, enumerated in the contract the same as in the prospectus and in the newspaper advertisements of sale, as being the sections within which the subject timber was located, varied in some respects from the land sections within which the subject tracts were actually located and within which they were sketched on the contract map.
Unit 15 was shown on the contract map as located in part, *122 as it actually was, within section 12, T. 25 N., R. 12 E., whereas that section was not enumerated in the contract description.
None of the subject tracts was located in or sketched within section 15, T. 25 N., R. 12 E., although that section was included in the contract description.
Units 2, 3, and 4 were shown on the contract map as located in whole or in part, as they actually were, within sections 16 and 17, T. 25 N., R. 12 E., whereas neither of such sections was included in the contract description.
32. The Forest Service timber management personnel, having direct knowledge of the Tonga Ridge cruise and sale preparation, and having rechecked the cruise data as late as two days before the auction bidding, believed that the cruise was reasonably accurate, and that the subject timber would cut out at about 73,100 M board feet. They believed that an overrun was as likely as an underrun.
33. As of July 1967, plaintiff had cut, removed and paid for 40,927 M board feet of merchantable timber from the Tonga Ridge sale. This included 3,320,230 board feet from unit 15, which had been only partially logged, and which was the only cutting unit on which logging operations had not been completed. Unit 15 contained a total of 8,474 M board feet of merchantable timber, as established by a cruise conducted for plaintiff by independent foresters in September 1966. Thus, 5,153,770 board feet remained to be cut from unit 15, and the total merchantable timber that had been and would be cut from the entire sale amounted to 46,081 M board feet. This was an underrun of 37 percent of the defendant’s cruise volume of 73,100 M board feet, stated in the contract.
The only type of timber which will produce more than its competitive bid volume is Western hemlock and Pacific silver fir, which will cut out in a volume of 41,717 M board feet, or 1,717 M board feet in excess of the competitive bid volume of 40,000 M board feet. Thus, plaintiff would receive the benefit of rate redetermination on only 1,717 M board feet, or on only 6.07 percent of the volume of 28,300 M board feet, to which redetermined rates under the contract would have been applicable, had the stated volume of 73,100 M board feet been realized.
The total of 46,081 M board feet, cut or to be cut on the *123 subject sale, was comprised of 2,843 M board feet of Douglas-fir, 1,221 of Western redcedar and Alaska yellow-cedar, 300 of Western white pine, and 41,717 of Yf estera hemlock and Pacific silver fir.
34. Throughout its logging operations on the Tonga Ridge sale, from the clearing of the road right-of-way to its felling and bucking of timber on unit 15, with the exception only of unit 6, plaintiff found excessive defects in the subject timber. Unit 6 was a relatively younger stand of timber, with smaller trees, whereas subject timber was otherwise over-mature and decadent, and generally undercut 35 to 40 percent of the cruised volumes throughout the units because of the defects found, such as brown rot, pocket rot, frost cracks, cracking from wind shake, heart check and stump rot. Defendant’s cruisers failed to make adequate deductions for such defects.
In connection with plaintiff’s claim submitted to and denied by the General Accounting Office, the Acting Chief of the Forest Service on June 14, 1961, advised the Comptroller General in part as follows:
Based on the experience from cutting to date it seems likely that the estimate of 73,100 M board feet will prove to be about 30 percent too high. This would be a more than normal variance, 'but it is within the range which is occasionally encountered. This was a sale of timber growing at higher elevations than timber previously cut on the Snoqualmie National Forest. At the time this timber was cruised, one comparable sale had been made but not completed. The risks of accuracy of volume determination are much greater for timber conditions where there is no cutting experience than for timber conditions where there is ample cutting experience. The primary factor contributing to the volume underrun in this sale is the substantially higher amount of hidden defect in the form of frost-crack and shake which cutting operations disclosed in the hemlock and silver fir located in the more exposed higher elevations. Examination of defect in down trees during the cruise failed to disclose the full amount of such defect.
35. As contemplated by section 7a of the contract (quoted in finding 21), the parties agreed on August 3,1956, that scaling services would be performed by the Puget Sound Log Scaling and Grading Bureau, a non-profit timber industry *124 organization. Plaintiff agreed to pay for stumpage cut on the subject tracts on the basis of the log scale as determined by the Bureau. Of the 40,927 M board feet cut prior to July 1957, 31,426 were scaled by the Bureau, and the rest by the Forest Service.
The evidence is insufficient to find that the undercutting of timber in this case was caused in whole or in part by variances between cruise techniques and cutting or scaling practices, such as pertain to measurements of diameters and volumes of logs, and cutting lengths of logs as compared to log lengths used in cruising. The evidence does not establish that there was any substantial loss of timber by sinking of logs in water transportation or by breaking of logs at the water dump used by plaintiff, or by cutting practices employed by plaintiff’s logging subcontractors.
36. The effect of the failure to realize the estimated volume of timber, coupled with the rate redetermination provisions of the contract, was to increase plaintiff’s expected overall average cost per M board feet. The effect of rate redetermination provisions is to raise the bid rates (or contract rates) on the competitive bid volumes, with the expectation that rate redetermination will lower the prices on the remaining timber, thus lowering the average cost. However, with the undercutting that occurred in this case, the redetermined rates never became applicable, except to the extent of 1,717 M board feet of Western hemlock and Pacific silver fir. The calculation of the loss of stumpage damages to the plaintiff, caused by the undercutting of the timber and the inapplicability of the redetermined rates, is as follows:

Douglas-fir

Contract volume_:_ 4,100 M b.f.
Rate redetermination effective after_ 3,000 M b.f.
Volume cut and paid for at contract rate_ 2,843 M b.f.
Contract rate_ $26.40
Redetermined rate_ $23.45
Average price paid_ $26.40
Average anticipated price:
($26.40X 3,000) + ($23.45X 1,100) / 4,100
$25.61
Difference_ $0.79
Excess payments for Douglas-fir: ($0.79X 2,843) = $2,245.97

*125
Western redcedar and Alaska yellow-cedar

Contract volume_ 2,200 M b.f.
Rate redetermination effective after_ 1,500 M b.f.
Volume cut and paid for at contract rate_ 1,221 M b.f.
Contract rate_ $11.80
Redetermined rate_ $11.65
Average price paid_ $11.80
Average anticipated price:
($11.80X 1,500) + ($11.65X700) / 2,200 $11.75
Difference_ $0.05
Excess payments for cedar: ($0.05X1,221) = $61.05

Western white pine

Contract volume_ 600 M b.f.
Rate redetermination effective after_ 300 M b.f.
Volume cut and paid for at contract rate_ 300 M b.f.
Contract rate_ $16. 60
Redetermined rate_ $17. 00
Average anticipated price:
($16.60X 300) + ($17.00X 300)/600 = $16.80
Average price paid_ $16. 60
Difference_ $0. 20
Deficiency in payments for pine: ($0.20X 300) = $60. 00

Western hemlock and Pacific silver fir

Contract volume_ 66,200 M b.f.
Rate redetermination effective after_ 40,000 M b.f.
Volume cut and paid for at contract rate_ 40,000 M b.f.
Volume cut and paid for at redetermined rate 1,717 M b.f.
Contract rate_ $27. 05
Redetermined rate_ $10. 30
Average price paid:
($27.05X40,000) + ($10.30X 1,717) 41,717 $26. 36
Average anticipated price:
($27.05X40,000) + ($10.30X26,200)/66,200 = $20. 42
Difference_ $5. 94
Excess payments for fiemloek and silver fir: ($5.94X41,717) = $247, 798. 98
*126 Douglas-fir_ $2,245.97
Western redcedar and Alaska yellow-cedar- $61.05
Western white pine_ ($60.00)
Western hemlock and Pacific silver fir_ $247,798.98
Total_ $250, 046. 00
The contract rates in the above schedules are set forth in finding 10, to each of which was added $0.90 for slash removal and reforestation, as provided by the contract. The above redetermined rates are contained in finding 15, with the slash and reforestation additions there noted.
37. Plaintiff constructed for defendant a permanent road system (Foss Biver road, main haul road, and lateral road) at an estimated cost of $539,600, which amount plaintiff was to recoup, as contemplated by the parties under the terms of the contract, on the basis of cutting out of sufficient quantities of the contract volume of timber, as required by the amortization rate provisions.
On the 46,081 M board feet of timber realized on the subject sale, plaintiff recouped $351,382.26 of the estimated road cost, computed on the timber type volumes realized, at applicable amortization rates, as follows:
Timber type M b.f. Rate type *
Douglas-fir_ 2,843 $17.64 $50,150.52
Western redcedar and Alaska yellow-cedar- 1,221 7.11 8,681.31
Western white 300 11.69 3,507.00
Western hemlock and). 40,000 6.72 268.800.00
Pacific silver fir)... 11.79 20,243.43
361,382.26 Total.
Thus, plaintiff has failed to recover $188,217.74 of the estimated road development costs, as a direct result of the undercutting of the contract volume of timber.
CONCLUSION OF LAW
Based upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered for plaintiff in the sum of $438,263.74.

 This quoted language -was in printed form in the contract, except that “1240” and the section, township and range descriptions were typewritten in blank spaces. Printed below the space provided for the land descriptions was “(Give approximate location and describe by relation to some well-known landmark, stream, etc. Give also legal subdivision if surveyed, and approximate legal subdivisions if unsurveyed).” Also, the printed phrase “as definitely designated on the attached map” had been altered by x-ing out the word “definitely”.

 Prospectuses in use in the pertinent region of the Forest Service in 1965 stated that no guarantee was made of estimated volumes, and prospective bidders were urged to examine the sale area and mate independent estimates.

 Defendant adduced evidence concerning a substantial number of sales which undercut both before and after consummation of subject contract, thoroughly considered in the preparation of these findings of fact, but concerning which, no detailed findings of fact are deemed necessary.

 At the time of the trial in this ease in 1967, it was the established practice of the pertinent region of the Forest Service to survey the boundaries of a tract of timber to be cruised for a proposed sale.

 Administrative relief for purchasers of timber, under contracts in which the timber has not been marked or designated until after the sale date, is now available under the 1965 revision of the timber sale contract form. Where error in the volume estimate will cause the volume cut to be less than 90 percent of the contract volume, the Forest Service on request will designate additional timber to be cut sufficient to bring the timber to be cut up to 100 percent of the advertised volume.