**E. R. McKEE d/b/a E. R. McKee Construction Company**

**v.**

**The UNITED STATES.**

**No. 558–71.**

United States Court of Claims.

July 19, 1974.

Kent P. Smith, atty. of record for plaintiff.

Leslie H. Wiesenfelder, Washington, D. C. with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before NICHOLS, KASHIWA and BENNETT, Judges.

PER CURIAM:

This case comes before the court on defendant's request for review of the opinion filed by Trial Judge Richard S. Gamer, on August 14, 1973, pursuant to Rule 54(b)(3), and plaintiff's response thereto. It has been submitted on the briefs and oral argument of counsel. It arises out of the denial by the Department of the Interior Board of Contract Appeals, 69–1 BCA § 7551, of a claim under the "Disputes" clause of a contract between plaintiff and defendant. The claim asserts a right to an equitable adjustment. The court agrees with the opinion of the trial judge and adopts the same as the basis of its judgment.

The opinion is self-sufficient, but we deem a few additional comments to be appropriate, as follows:

*First:* Since the trial judge's decision, we have held in Stock & Grove, Inc. v. United States, 493 F.2d 629, 204

Ct.Cl. —— (1974), that in light of "indications" in a contract and in the associated bid documents, the plaintiff there was entitled to rely on the availability as "indicated", of a quarry necessary for contract performance. Such quarry proving unsuitable, the plaintiff was awarded an equitable adjustment for a changed condition. Similarly, in the case now before us, defendant "indicated" in *Stock & Grove* language, that plaintiff could have surface access to the work site by constructing a road along an existing pack trail, the so-called Kenney horse trail, represented to be on Government owned lands. In view of the legal effect of these factual "indications", the exact extent of defendant's contract commitments lose the controlling importance assigned them by the parties. Fact "indications" reasonably relied on are enough for a category 1 Changed Conditions claim. We also agree with the trial judge that there was a compensable Change Order. The claim was prosecuted under both heads.

*Second:* The gist of the trial judge's decision is that, unknown to plaintiff and to defendant's officers also, the Kenney horse trail in fact wandered off Government land and into tribal lands of the Crow Indians. Plaintiff, therefore, following the horse trail in constructing his access road, trespassed on tribal lands and was forced to stop the road by the Indians' protests. He completed the work using helicopters for access, at increased cost, for which he seeks equitable adjustment here.

Defendant in face of this conclusion insists that a Board finding to the contrary binds us by Wunderlich Act standards, being supported by substantial evidence. It admits there is no other evidentiary support except that recited in the finding itself, which reads as follows:

\*    \*    \*    \*    \*    \*

The record is silent as to the precise location of the horse trail in reference to Government land and the contiguous Crow Tribal lands. In the absence of evidence to the contrary,

the trail was presumably constructed entirely on Government land as depicted on the map, Exhibit A. This was the route licensed by the Government; [27] there is no evidence

27. Tr. 51.

of a violation of the license. This presumption is further supported by photographs No. 459–640–1629 and 459–640–1662 attached to Finding No. 2, each of which shows a clearly defined trial well down the talus slope within the Bighorn Canyon extending both upstream and downstream from the point where appellant's road cut through the canyon rim.[28]

28. There is no dispute that the land lying below the canyon rim and within the canyon itself is within the Government taking boundary.

Exhibit A is a small scale two dimensional map or plan, without contour lines although the trail was to lead down the side of a canyon. It affords no evidence that the exact route had been plotted or engineered. It is captioned "Proposed Trail." It manifestly affords no evidence whether the trail was actually built wholly on Government lands or otherwise. The nature of the Board's presumption is obscure. Plaintiff without contradiction testified his road followed the trail and it is undisputed that the road actually did encroach as the Indians complained it did. See Exhibit B.

The two photographs referred to were attached to, and were part of, the contracting officer's findings. They were dated November 27, 1963, and January 14, 1964. Apparently they were taken from an aircraft over the canyon, looking towards the canyon wall at the point plaintiff's access road passed over the rim at mile 4 and started down the wall. It has just reached the rim in the earlier picture and has progressed some way down in the second. Both photographs are accompanied by captions, apparently supplied by the contracting officer. Who wrote them does not appear, but their text suggests they were not written when the photographs were taken, but rather when the findings were pre-

pared. The caption to the earlier picture states that lines observable in the lower right and left corners are the Kenney horse trail. A line stretching clear across the later picture is apparently the same trail. If the caption is correct, it would follow that the road and the horse trail were quite a way separate at mile 4, despite plaintiff's testimony. The Board, though not so stating, must have read the caption and based its finding upon it. One cannot tell just by examining the pictures whether the observable marking is a horse trail, a foot trail, or a natural fault in the rock. Though one of the photographs was used in the testimony for other purposes, no testimony was taken about the markings, crucial though the point would seem, and easy as it should have been then to establish it one way or the other. Plaintiff suggests to us the markings actually show a foot trail, but it is as impossible for us as it is needless to determine this point now. The Board finding must stand or fall entirely upon the authority of the caption.

■ The caption is "rank hearsay" in the trial lawyer's phrase. In an administrative hearing "rank hearsay" not only is admissible, depending on the applicable regulations, if any, but can constitute substantial evidence if sufficiently convincing to a reasonable mind. Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Peters v. United States, 408 F.2d 719, 187 Ct.Cl. 63 (1969). However, mere hearsay lacking sufficient assurance of its truthfulness is not substantial evidence to overcome the sworn testimony of a claimant. Reil v. United States, 456 F.2d 777, 197 Ct.Cl. 542 (1972); Jacobowitz v. United States, 424 F.2d 555, 191 Ct.Cl. 444 (1970).

The caption is not sworn and otherwise lacks the features deemed in the above cases to supply credibility. The declarant is unidentified. It is at best part of the contracting officer's findings, and these are not normally considered evidence in a *de novo* Contract Appeal Board disputes clause proceeding.

Moreover, and most siginificant of all, the failure of Government counsel to rely on or else supplant the caption with competent evidence to the same effect raises a question whether he believed the caption was accurate. Had it been the best evidence available and had he asked the Board to accept it, the situation would have been entirely different.

■ The photographs, with or without captions, are not substantial evidence that the horse trail was in the location asserted by the Board, and therefore the evidence that plaintiff's road followed the horse trail is uncontradicted and unrefuted.

Defendant's motion for summary judgment is denied. The plaintiff's motion for summary judgment is granted. The case is remanded to the Department of the Interior Board of Contract Appeals pursuant to Pub.L. 92–415, 86 Stat. 652, and the court's General Order #3 of 1972, implementing such statute, for it to determine the amount of the equitable adjustment due plaintiff. In accordance with this court's General Order #3 of 1972, plaintiff's attorney of record shall advise this court, by letter to the clerk, of the status of the remanded proceedings. Such advice shall be given at intervals of 90 days or less, commencing from the date of this opinion.

The trial judge's opinion adopted by the court, is as follows:

GAMER, Trial Judge: This dispute grows out of a $597,555 contract plaintiff entered into with the Bureau of Reclamation, Department of Interior, for the clearing of certain parts of the Yellowtail Reservoir site, located in Montana and Wyoming. The site is situated along the main course of the Bighorn River and its tributary streams, extending upstream from the Yellowtail Dam in Big Horn County, Montana.

During the course of operations, plaintiff gave notice of a claim for alleged additional costs incurred because of lack of land access to an important

portion of the area to be cleared. Upon completion of the contract, plaintiff presented his claim, in the amount of over $135,000, to the contracting officer.

The Reservoir site is located in a very rugged area. The Bighorn River runs through narrow canyons some of which have sheer cliffs extending from their rims down to places where the terrain begins to slope to the bottom of the canyon (such slopes, often composed of relatively loose debris, being sometimes referred to as "talus slopes"). Included in the area to be cleared was Black Canyon, a rugged area of over 3 miles long, which extended at an angle from the main canyon of the Bighorn River commencing at a point approximately 5 miles upstream from the damsite, and which encompassed Black Canyon Creek, a tributary of the Bighorn River. This canyon contained many large trees which were in the designated clearing area. The work of clearing Black Canyon comprised approximately one-half of the entire contract work. Gaining access into the canyon presented a particularly difficult problem because of its sheer cliffs and steep rocky slopes.

The area between the damsite and extending along Bighorn Canyon to Black Canyon encompasses Crow Indian Tribal land. The Government had, however, taken by condemnation such land as was necessary for its project (described as the "Yellowtail Unit, Montana-Wyoming, Lower Bighorn Division, Missouri River Basin Project"). The Government land is referred to as the "taking area." There was an unimproved "pack trail" in existence which certain Bureau of Reclamation drawings showed as being within the taking area, and which ran from the vicinity of the damsite, on a plateau next to Bighorn Canyon, along the rim area of the main canyon and into the canyon at a point around 4 miles upstream from the damsite. Plaintiff intended to improve this trail into a road over which he could move heavy machinery, because once down into this part of the main canyon he would be able to reach Black Canyon.

This pack trail constituted the only feasible land access to Black Canyon, and defendant consented to this plan of operation.

It turned out that, after doing considerable work to improve the trail into a usable construction road, plaintiff was ordered by defendant to halt all further road operations and to remove from the road all equipment thereon intended to be used for clearing purposes. This order followed a determination by the Bureau that plaintiff's road in part encroached upon Crow Tribal lands. No other land access to Black Canyon being available, plaintiff was required to use helicopters to support his men and equipment into the canyon. Plaintiff's claim submitted to the contracting officer was premised upon the alleged increased cost of operating in such a fashion. For one thing, plaintiff was required to perform this portion of the work by men using hand methods and by light machinery, instead of with heavy machinery. Plaintiff construed certain provisions of the contract specifications as requiring defendant to provide, under conditions which plaintiff contended were met, land access to the areas required to be cleared.

The contracting officer, construing the claim as grounded upon defendant's failure to supply a road right-of-way in accordance with alleged contract obligations, denied it on the ground that it was one for breach of contract, a type of claim which he felt he was powerless to entertain. However, on appeal to the Interior Board of Contract Appeals, plaintiff explicitly based his claim under either the standard "Changes" or "Changed Conditions" articles included in the contract. The Board then remanded the claim to the contracting officer for the makings of findings on the merits after giving specific consideration to the applicability of such clauses to the claim. E. R. McKee Constr. Co., 65–2 BCA ¶5296. The contracting officer thereafter made such findings and concluded that plaintiff was not entitled to any relief under such articles. On

appeal, the Board, following a hearing, affirmed the contracting officer's denial of the claim. The Board held that plaintiff had failed to show that the claimed additional costs "resulted from a changed condition or from a change, either actual or constructive." E. R. McKee Constr. Co., 69–1 BCA ¶7551. Plaintiff thereupon filed this suit, seeking review of the Board's decision under the Wunderlich Act, 68 Stat. 81 (1954), 41 U.S.C. §§ 321–322 (1970).

It is concluded that defendant's road construction stop order, and plaintiff's thereafter being deprived of land access to the Black Canyon area, constituted a change within the meaning of the Changes article of the contract.

The essence of the Board's decision denying plaintiff relief under the Changes article is that there was no showing that defendant ordered plaintiff to use the trail in question; that it was up to plaintiff "to get to the work site in that fashion [by land access] or by any other route or means"; that plaintiff failed to show that the pre-existing trail veered in any manner onto the contiguous Indian lands; and that plaintiff must bear the responsibility of its having trespassed on such lands. In view of the following legal considerations and the specific facts upon which they are based, which are either as found by the Board or are not, or could not be, in dispute, these conclusions cannot stand.[1]

I

Mr. J. R. Granger, stationed at the Yellowtail Project office in Hardin, Montana, was the Bureau of Reclamation's Project Construction Engineer on this project. He was in general charge of all matters pertaining to construction operations and was, prior to the Bureau's issuance of invitation for bids for the contract here involved, formally designated as the "authorized representative of the contracting officer in all matters pertaining to field construction and inspection under the [clearing] contract which is to be entered into * * * ."[2]

A trail had existed from the damsite area and extending along the rim of the main canyon. Some time in 1962, Mr. Stephen J. Kenny of Hardin, Montana, requested permission of Granger's office to improve this trail so that he could use horses to bring people into Bighorn Canyon. Kenny gave assurance that he could make such improvements and stay entirely on Government land. Granger granted the request since, having the instant prospective clearing contract in mind, "it was impossible to get near the work at the lower end of the trail and prospective bidders could be taken into the canyon by this route * * * ."[3] The trail went into Bighorn Canyon at a point about four miles from the damsite, and from the bottom of that part of the canyon it was possible to reach Black Canyon.

A drawing dated August 3, 1962, was prepared by Granger's office showing the route of the "Proposed Pack Trail." This was treated as Kenny's license to improve the trail and showed his proposed trail as being entirely on Government land.[4] Kenny then proceeded with his work of improving the trail into a pack trail (sometimes thereafter referred to as the "Kenny Horse Trail").

The invitation for bids for the clearing project provided that bids would be

---

1. Factual statements not specifically appearing in the Board opinion are referenced to the pertinent parts of the 10-volume Board Record filed with the court.

2. Memorandum dated August 2, 1963, to Granger from the Bureau's Assistant Regional Director, Bd. Rec., Vol. I, item 3.

3. Memorandum dated February 13, 1964 from Granger to the Bureau's Regional Director at Billings, Montana, Bd. Rec., Vol. I, item 15. Also see transcript of testimony before the Board, Bd. Rec., Vol. V, p. 49 (hereinafter cited as "Tr.").

4. Drawing 459–640–254, marked Exhibit A, and included in Bd. Rec. Vol. VII. This drawing was Exhibit A to the contracting officer's findings of fact (as shown by p. 4 of such findings, which are included in Bd. Rec., Vol. II.)

received (at the Bureau's office at Fort Smith, Montana) until September 12, 1963. Included in the General Conditions portion of the contract specifications, which were issued with the invitation, was a Paragraph 3, entitled "Rights-of-way," which provided:

3. *Rights-of-way*

The Government will provide the right-of-way or the site for permanent works or installations, the site for borrow pits, channels, spoil banks, and ditches, and right-of-way for access thereto over routes established by the contracting officer. The contractor will be permitted to use such land for construction purposes, but any additional right-of-way or land desired by the contractor for construction purposes shall be provided by the contractor without expense to the Government.

In addition, Paragraph 28 of the Special Conditions (Local Conditions) portion of the specifications, entitled "Access to the Work," provided:

28. *Access to the Work*

Rights-of-way for access to the work from the public roads will be provided by the Government only on existing roads and trails on Government-owned lands. The contractor may construct new trails and roads on Government-owned lands under Bureau of Reclamation withdrawal or administration. In the event the contractor considers that additional access routes are required as the work progresses, he shall make request to the contracting officer as far in advance of the actual need as practicable in order that the right-of-way may be secured if considered necessary by the contracting officer. The Government assumes no responsibility for the condition or maintenance of any proposed access route,

or of any existing road, trail, or structure thereon that may be used by the contractor for the performance of the work under these specifications. The contractor will be permitted to build roads and trails below elevation 3550 in the reservoir area in Schedules No. 1 and No. 2. Any trails or roads that the contractor proposes to construct in Schedules No. 1 and No. 2 in the reservoir area leading to or crossing elevation 3644 must be approved in advance by the contracting officer. It is desired to hold the scars of such trails and roads in these two schedules to a minimum because of the proposed National Recreation Area.

Any and all work required along the routes to provide suitable access to the work shall be performed by the contractor, and the cost of all such work shall be included in the lump sum prices bid in the schedules for clearing.[5]

Prior to the bid opening, plaintiff inspected the areas involved. He made inquiry concerning the available routes providing access to the Black Canyon area and was advised by Granger that the pack trail constituted the only access. He informed plaintiff that if plaintiff so desired he could use and improve the trail into a construction road. Plaintiff and two of his employees were shown the trail and the three of them walked it.[6] Plaintiff concluded he would use the trail and improve it into a road over which he could move heavy machinery into Black Canyon. The drawings attached to and made a part of the specifications also showed a "pack trail unimproved" running from the damsite area to and along the main canyon.

Plaintiff was awarded the contract on October 15, 1963, and on October 29, 1963, was given notice to proceed. On November 5, 1963, plaintiff's crew, un-

5. The invitation for bids called for the clearing of only certain of the areas comprising the Yellowtail Reservoir site. Three areas were involved, each described in Paragraph 12 of the specifications, as Schedules 1, 2 and 3. Plaintiff's contract only covered the areas delineated in Schedules 1 and 2. In both areas, clearing was required between elevations 3550 and 3644.

6. Tr. pp. 19–20, 41–42, 53, 70.

der the supervision of Mr. Donald L. Holmes, one of plaintiff's employees who had inspected and walked the trail, commenced the road work.

On November 11, 1963, Holmes was advised by Kenny, who was using the trail to take some horses into Bighorn Canyon, that plaintiff's road trespassed on Crow Tribal land. Holmes immediately suspended operations, so informed plaintiff, who was then at his principal place of business in Hulbert, Oklahoma, and plaintiff promptly came to the site. The following day plaintiff and Holmes conferred with Granger about what Kenny had stated. Granger reiterated, however, that the trail was entirely on Government land and that if plaintiff stayed on the trail, or below it, i. e., on the talus slopes (which, in certain areas, commenced at the rim of the canyon), he would not be trespassing. Granger showed plaintiff and Holmes the August 3, 1962 "Proposed Pack Trail" drawing constituting the Kenny license and indicating the trail as being entirely on Government property,[7] (the drawing being frequently referred to as "Exhibit A" since it was so marked and appended to the contracting officer's findings of fact). Thus being reassured, plaintiff directed his road crew to resume operations the following day.

However, on January 28, 1964, three employees of the Interior Department's Bureau of Indian Affairs unexpectedly arrived at the project office and advised that the Crow Indians had complained that, without their grant of any permission, plaintiff's access road crossed their lands.[8] The Reclamation and Indian Bureau employees then examined an aerial photo upon which the route of plaintiff's access road was sketched and it was agreed that the road did in fact encroach upon Crow Tribal lands. The Indian Bureau employees then expressed concern that the matter was arising just when certain negotiations between the Interior Department's National Park

Service and the Crow Tribe about developing a recreational area (which was to be created as part of the project) were at a critical stage. They feared that the incident might provide additional ammunition to those members of the tribe who were opposed to cooperating with the Government. They accordingly requested that (a) plaintiff be immediately forbidden to make further use of the road; (b) that he be required to remove all of his equipment therefrom (use of those parts of the road crossing the Indian lands being necessary to service plaintiff's equipment, which was at that time located within the taking area); and (c) that the Bureau of Reclamation follow its customary procedure of submitting to the Indians an application for permission to use the lands for the purpose in question. The Reclamation Bureau employees agreed that this procedure would be adopted. Granger being absent from the office at that time, the Acting Project Construction Engineer, Mr. C. C. Mathany, then verbally ordered plaintiff's superintendent Holmes to stop the road construction work and to remove the equipment. Upon being informed by his superintendent of this development, plaintiff requested that the order be put in writing, and on the following day, January 29, 1964, Mathany sent such a letter to plaintiff. The letter stated that Paragraph 28 of the specifications provided that defendant would furnish rights-of-way for access to the work "only on existing roads and trails on Government-owned lands"; that plaintiff was "currently in trespass on Crow Tribal lands in transporting men and equipment to both sides of the Big Horn River and in the construction of portions of the access road"; that "[y]ou are requested to remove all men and equipment located on Tribal lands and are denied the right to cross such lands until further advised"; and "[i]mmediate action is being taken to secure right-

---

7. Bd. Tr. p. 64.

8. Bd. Rec., Vol. I, item 10.

of-way for the currently used access to the work site. \* \* \* " 9

Thereafter, plaintiff suspended work on this portion of the contract pending the attempt, both by plaintiff and the Bureau of Reclamation, to obtain the required permission from the Tribe. However, such permission was not forthcoming. By letter of April 29, 1964, to defendant, plaintiff's attorney advised that plaintiff would soon complete all other portions of the contract work and would then be ready to proceed with the Black Canyon portion, and that the right-of-way situation and defendant's failure thus far to resolve it had disrupted plaintiff's operations and caused him increased expense. After stating that: "We realize that your department is making an effort at this point to acquire access from the Crow Tribe," he requested that defendant "advise us when access is acquired in order that the [clearing] crew may be notified as soon as possible, thereby minimizing loss of time and expenses to your department." 10 When, by June 17, 1964, the Crow Tribal Council again failed to act upon the Bureau's longstanding right-of-way application, plaintiff, having already completed all other work on his contract, decided to terminate the long delay on the Black Canyon portion of the work and to proceed by using helicopters to gain access to the area. He had already commenced using of June 22, 1964, his attorney so advised a helicopter for such purpose. By letter Granger, stating:

It appears that the only way to complete this job is to continue to use the helicopter method of getting personnel and light equipment on the job. I believe that we all realize that this is a more costly method of brush removal, but in light of the right of way problems it appears to be the only logical way to approach the problem.

Mr. McKee, therefore, intends to complete the contract without the use of the roadway and the heavy machinery, and will expect to be recompensed for the additional costs of this method. Meanwhile, he intends to minimize the costs as much as possible.11

By letter of June 29, 1964, Granger asked plaintiff to "confirm that, at this time, you do not intend to use the access road for completing the remaining portion of the work under your contract." 12 On July 6, 1964, plaintiff responded that:

\* \* \*. We do intend to use the access road if right of way is obtained before the major portion of our contract is completed. We do not intend to delay work on our contract due to the lack of right of way even though it is more costly to use helicopter service.

We have moved our tractors to another job to defray cost of down time. If right of way is obtained we intend to move our equipment back to the job site so that work may be completed with less expense to you.13

Plaintiff completed the clearing work in the area in question at the end of August 1964. No right-of-way had been obtained by the Bureau from the Tribe. Plaintiff completed all of his contract work satisfactorily and prior to the contract completion date.

## II

A. The Board held that under Paragraph 28 of the Special Conditions of the specifications "[a]ccess to the work site was the responsibility of the contractor," which he "was required to furnish on his own initiative." This is a misconstruction of the contract.

■ The above-quoted "Rights-of-way" Paragraph 3 of the General Conditions of the specifications, which the Board referred to and quoted in full in

9. Bd. Rec., Vol. I, item 11.

10. Bd. Rec., Vol. I, item 28.

11. Bd.Rec., Vol. I, item 33.

12. Bd.Rec., Vol. I, item 35.

13. Bd.Rec., Vol. I, item 36.

its first decision, but which it merely mentioned in its second decision as being "applicable to this appeal," flatly states that "[t]he Government will provide the right-of-way or the site for permanent works or installations * * *, and right-of-way for access thereto over routes established by the contracting officer," and that "[t]he contractor will be permitted to use such land for construction purposes." Certainly plaintiff was, under these provisions, justified in concluding that he would be provided with land access to the areas he would have to clear.

Plaintiff further relies on the first sentence of the above-quoted Paragraph 28 of the Special Conditions, providing that "[r]ights-of-way for access to the work * * * will be provided by the Government only on existing roads and trails on Government-owned lands." He argues that this sentence, properly interpreted, in effect constitutes a representation that there were in fact in existence on Government lands such roads and trails as would provide access to the worksite. Defendant contests this interpretation, contending that the sentence only means that the Government would permit the contractor to use such roads and trails as actually were on Government lands, and that the Government was making no representation, implicit or otherwise, that there were in fact any such roads or trails in existence. However, it is not necessary to resolve this particular controversy because, even if defendant's interpretation of the sentence is adopted, it is still faced with the additional sentence in the same paragraph providing that if "the contractor considers that additional access routes are required as the work progesses, he shall make request to the contracting officer as far in advance of the actual need as practicable *in order that the right-of-way may be secured if considered necessary by the contracting officer.*" (Italics supplied.) Certainly under these two provisions read together a bidder would reasonably be entitled to believe that he would be provided with

some land access to the areas to be cleared, if he desired to operate in such a manner, even though such access route would not be entirely on Government lands.

Plaintiff did in fact comply with these provisions. As soon as the contract was entered into, plaintiff sought and obtained permission (which he was assured during the precontract period would be granted to the successful bidder) to improve and use the pack trail, it then being assumed by both plaintiff and Granger that the trail was entirely on Government land. And later as the work progressed, and the assumption proved to be erroneous, plaintiff did consider that an access route additional to that provided to him on Government land was required; he did make request for such route; and the authorized representative of the contracting officer obviously considered the requested route "necessary" since he promptly and over a long period of time attempted to obtain it.

While the Board concedes that under Paragraph 28 "the Government agrees to undertake to secure any access right-of-way required by the contractor over non-Government land upon the advance request of the contractor," it excuses defendant's failure to provide the access because "appellant did not request the Government to secure access right-of-way prior to the time he was stopped and * * * thereafter it was impossible to secure the same." But the fact that plaintiff's request was not made "prior to the time he was stopped" is irrelevant. The provision itself contemplates requests "as the work progresses."

Any possible doubt as to the proper construction of these provisions is dispelled by the intent of the parties as evidenced by their contemporaneous interpretations. On a contract of this kind in such a rugged area, ability to obtain feasible access to the worksite is obviously of prime importance. Granger fully recognized this. An important consideration motivating his decision to authorize Kenny to improve the trail

was the enabling of the contractor on the forthcoming clearing contract to gain access to the areas in question. Defendant well knew that in an area of this kind the bidders would calculate the costs of transporting the clearing crews and equipment to the work areas and would consider whether the clearing would have to be done by hand or other methods. A Reclamation Bureau memorandum transmitting the specifications to the Bureau's Chief Engineer for final approval prior to the calling for bids stated, with respect to a revision made concerning the access-to-the-work provisions: "It is believed that if the Government did not assist the contractor in obtaining necessary access, the contingency for access might be high." [14] When on January 28, 1964, the Indian Bureau employees first informed the Reclamation Bureau of the Tribe's trespass complaint, with speculation ensuing concerning the effect the incident might have on certain negotiations then underway, the Reclamation employees pointed out "that our clearing specifications provide that we will secure right-of-way for access deemed necessary when requested by the contractor." [15] And the Bureau's prompt action, after issuing its stop order to plaintiff, in submitting its application to the Tribe for the right-of-way, and thereafter pressing for its approval, is hardly consistent with the Board's conclusion that the Bureau had no obligation whatsoever in the matter. Indeed, the stop order itself indicated that it was only temporary in nature. It stopped plaintiff's use of the trail "until further advised" and stated that "[i]mmediate action is being taken to secure right-of-way for the currently used access to the work site." While it

is true that the Bureau could not be expected to do the "impossible," it does not follow that, when the Bureau fails in its efforts to carry out the plan of operation envisaged by the specifications, the contract leaves the contractor without recompense.

B. As further grounds for denying an equitable adjustment, the Board held that plaintiff had failed to prove that "the horse trail route was not on Government land, and in fact trespassed on Crow Tribal lands," and "that in attempting to improve the trail to accommodate heavy machinery, he in fact stayed on the horse trail route." Thus, because "the trail was presumably constructed entirely on Government land as depicted on the map, Exhibit A," and because plaintiff allegedly made no proper inspection or inquiry as to the route of the trail, the Board felt that the trespass was attributable to plaintiff's own negligence. Defendant points to the "Investigation of Site" contract provisions imposing upon bidders an obligation to "visit the site of the work and by their own investigations satisfy themselves as to the existing conditions affecting the work to be done * * *." [16] It argues that if the trail did in fact veer onto Indian lands, and even if defendant mistakenly thought it was wholly on Government land, it was nevertheless plaintiff's responsibility under this contract provision to have ascertained the true facts by his own investigation.

◼ The presumption that the Kenny trail was entirely on Government land and that plaintiff's trespass was therefore due to his negligently straying off the trail while improving it, is not sup-

---

14. Bd.Rec., Vol. I, item 2.

15. Bd.Rec., Vol. I, item 10, p. 2.

16. The provision, Paragraph 25 of the "LOCAL CONDITIONS" portion of the specifications, reads as follows:
"25. *Investigation of Site*
Bidders are urged to visit the site of the work and by their own investigations satisfy themselves as to the existing conditions af-

fecting the work to be done under these specifications. If the bidder chooses not to visit the site he will nevertheless be charged with knowledge of conditions which a reasonable inspection would have disclosed. Bidders and the contractor shall assume all responsibility for deductions and conclusions as to the difficulties in performing the work."

**536**

ported by any substantial evidence. The credible evidence is all the other way:

■■ As shown, a basic presumption on defendant's own part was that the trail *was* wholly on Government property, and that, in the interest of minimizing the access contingency, bidders would be permitted to improve and use it. Before bidding, plaintiff and his supervisory employees *did* carefully investigate the site. They saw the trail, walked it all the way into the canyon, correctly ascertained it was the only feasible land access to the Black Canyon area, and were expressly advised by the authorized representative of the contracting officer that, if plaintiff were the successful bidder, he could improve and use it. Implicit in this unqualified advice that it was his to use was the fact that the trail *was* on Government land. The specification provision upon which defendant relies requires only "a reasonable inspection." Plaintiff's inspection surely meets this test. Further, there appears to be no disagreement that the specification drawings depicting the areas to be cleared showed the pack trail as being within the taking area, or that at least that was a reasonable interpretation thereof. Certainly there was hardly an obligation on the bidder's part thereafter to embark upon a detailed survey of his own to check upon the accuracy of the contract drawings and of the statements of defendant's authorized representative. Presumably defendant knew the boundaries of its own land before it called for bids.

It seems clear that, contrary to the presumption indulged in by the Board, the trespass was in fact due to the Kenny trail's encroaching on the Indian lands, and not to plaintiff's negligently straying from the trail. No one contemporaneously accused plaintiff of not staying on the trail—neither Granger himself nor any of defendant's inspectors or other employees.[17] When, upon the request of his administrative superior, the Regional Director, Granger was called upon to explain "why this contractor was permitted to operate off the right-of-way before necessary permits were obtained,"[18] he responded:

> We did not realize the Kenny trail had strayed off our right-of-way at points or our contractor had also until we were notified by the Bureau of Indian Affairs.[19]

On Kenny's assurance that his trail would be entirely on Government land, as the drawing of the then proposed improved trail (Exhibit A) indicated, Granger permitted Kenny to proceed. Actually, Granger had never seen the Kenny improved trail nor had it surveyed—he simply assumed it had been built entirely on Government land as the drawing showed.[20] As Granger testified, it was only later:

> * * * in 1964 when this [Exhibit A] was examined we found that Kenny did stray off the trail that he showed here.[21]

After the bid opening, the formal recommendation to the Regional Director for an award of the contract to plaintiff stated flatly: "Right-of-way required for Schedules Nos. 1 and 2 is available."[22] None of the testimony at the hearing was to the effect that plaintiff strayed off the trail. Plaintiff's witnesses repeatedly testified that all the road work was on the trail, which was clearly visible.[23] Neither of the two Government witnesses, one of whom was an inspector on the job, in any way intimated that plaintiff strayed from the trail.[24] Indeed, no explanation is offered as to why plaintiff would want to veer from the already established trail

17. Bd.Rec., Vol. IV, Inspector's Daily Reports.

18. Bd.Rec., Vol. I, item 10, p. 5.

19. Bd.Rec., Vol. I, item 15.

20. Bd.Tr. p. 51.

21. Bd.Tr. p. 50.

22. Bd.Rec., Vol. I, item 4, p. 1.

23. Bd.Tr. 17–19, 26–27, 45, 58.

24. Bd.Tr. pp. 93–108.

or what his motivation would possibly be to do so. The trespass occurred on the plateau area leading to the canyon rim, an area which the record does not indicate presented any particular construction difficulty.

▪ The Board further observes that:

> * * * Even after stopping construction temporarily upon being warned of a possible trespass, he made no further inquiry as to where he [McKee] encroached on Indian land. He resumed construction on his own initiative in the same area and along the same alignment and continued until he was permanently stopped some ten weeks later. Such actions do not support a claim of constructive change.

However, in view of the fact that, after the warning of the possible trespass and the resulting temporary stoppage, plaintiff did immediately confer with Granger and received assurances from him that the trail was on Government land and that, if plaintiff "stayed on the horse trail or below" he would be "safe," the finding that plaintiff made "no further inquiry as to where he encroached on Indian land" and that he "resumed construction on his own initiative," plainly lacks the requisite support.

C. Defendant further argues that, even if plaintiff was in no way at fault and the contract provisions as to access to the worksite are to be construed as plaintiff urges, plaintiff is still not entitled to recover because what would then be involved would constitute a breach of contract. This breach, says defendant, occurred on March 9, 1965, when the contract was completed and accepted, at which time plaintiff could have brought suit for the damages he suffered as a result of his failure to receive a right-of-way that would have afforded him access to the Black Canyon work area. However, since plaintiff did not file suit in this court until July 22, 1971—more than 6 years after March 9, 1965—its claim is, defendant contends, barred by the 6-year statute of limitations applicable to this court. 28 U.S.C. § 2501. The "Changes" article contained in this contract (as Article 3 of the General Provisions), which authorizes the contracting officer to "make changes in the drawings and/or specifications," is inapplicable, defendant urges, because no such change was ever ordered.[25] On this basis, defendant takes the position that plaintiff's long pursuit of administrative relief under the standard form of disputes article contained in the contract (Article 6 of the General Provisions) was not necessary since no relief was affordable under the contract.

This contention lacks merit. As pointed out, the contract drawings depicted the clearing areas and the "pack trail (unimproved)" running from the vicinity of the damsite, located on the plateau area adjacent to the main Bighorn River canyon, and extending over such plateau area to and along the canyon rim. They gave no indication whatsoever that the trail was not entirely within the taking area. The clear inference was that what was depicted was entirely on Government land (as the Bureau of Reclamation actually thought). When, because it turned out that the trail was not entirely within the taking area, defendant ordered plaintiff to change its construction procedure, a procedure which defendant had previously expressly approved, defendant was, in effect, effecting a change in the drawings.

Similarly, when defendant found that it was mistaken in its belief that, in compliance with Paragraph 3 of the

---

25. The article provides in pertinent part as follows:

"The Contracting Officer may, at any time, by written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract if within its general scope. If such changes cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment shall be made and the contract modified in writing accordingly. * * *"

General *Conditions of the specifications*, it was providing a right-of-way to the clearing site, and consequently found it necessary to issue the stop order, defendant was directing a change in the contractor's method of performing an important segment of the contract work, a method defendant had previously explicitly approved. That stop order and the operational change it effected, originally considered to be temporary, turned out to be of a permanent nature when defendant was unable, under Paragraph 28 of the Special Conditions, to provide the contractor with the rights-of-way additional to those on Government land. A contracting officer's directed change in the contractor's method or manner of performance of the work is compensable under the form of changes article here involved. *Liles Constr. Co. v. United States*, 455 F.2d 527, 531–532, 197 Ct.Cl. 164, 172–174 (1972).

Further, paragraph 15(a) of the Special Conditions of the specifications, entitled "Commencement, Prosecution, and Completion of Work," subjects the contractor's "method of operation" to the approval of the contracting officer. As noted, the authorized representative of the contracting officer did approve the contractor's land-access-to-the-site "method of operation," but later caused *a change in such manner of prosecuting the work.*

■■ In determining whether a claim is administratively redressable by way of an equitable adjustment under the Changes article, *the court will give weight to the practice adopted by the agency itself and its contract appeals board.* Schlesinger v. United States, 383 F.2d 1004, 1007, 181 Ct.Cl. 21, 26–27 (1967). The Board, in this instance, apparently had no such doubts concerning its competence to afford such administrative relief. After the contracting officer refused to entertain the claim because, as he diagnosed it, it was one based upon a "breach of contract," the Board, on appeal, remanded it to him for the making of findings on the merits under the Changes (and Changed Conditions) article. And on plaintiff's second appeal, in the face of defendant's persistence in asserting lack of jurisdiction to entertain such a "breach of contract" claim, the Board proceeded to decide the case on the merits.

Since the second Board opinion was not rendered until March 4, 1967, plaintiff's 1971 petition was timely. *Conn v. United States*, 366 F.2d 1019, 177 Ct.Cl. 319 (1966).

D. Throughout this case—at the contracting officer and Board levels, as well as before this court—defendant has criticized plaintiff's decision to gain access to Black Canyon by converting the pack trail into a construction road capable of supporting heavy equipment. It says that building a road in such a rugged area and on such steep slopes would have been unduly time consuming and expensive. It takes the position that, in effect, defendant did plaintiff a favor by preventing him from proceeding further with this costly mistake.[26]

Since, as indicated (a) it was the Bureau considered opinion that its providing land access to the clearing areas would lower the contractor's costs and therefore benefit the Bureau by resulting in reduced bids, (b) the pack trail was, in Granger's opinion, the only feasible access to the important Black Canyon part of the contract area, and (c) the contractor's use of this method of operation was undertaken with Granger's knowledge and consent, and without any criticism on his part, this particular attack against the contractor is difficult to understand. In any event, it is, at this stage of the proceedings, irrelevant. Only the question of liability is now under consideration, the Board having specifically, with the consent of both parties, so limited the issue. In the fur-

---

26. As one employee of the Bureau put it: "In this instance, it would appear that fate and the Indians stopped a gross error in judgment on Mr. McKee's part soon enough to prevent it from costing him large sums of money." Bd.Rec., Vol. VII, Exhibit E, p. 4.

## 539

ther proceedings to determine the amount of the equitable adjustment to which plaintiff is entitled, it will at that time be appropriate to give full consideration, in ascertaining plaintiff's excess costs (if any), how much plaintiff's actual costs (assuming they were reasonable) in gaining access to the clearing site in question by the helicopter method of operation, exceeded what plaintiff's cost reasonably would have been had he performed such clearing work by the land-access method. *See* Roscoe-Ajax Constr. v. United States, 458 F.2d 55, 60, 198 Ct.Cl. 133, 142 (1972).

### III

Defendant tenders a defense here which was not previously presented to the Board. It attaches as an exhibit to its brief the release which plaintiff executed upon its completion of the contract and its receipt of the final amount paid to him. Defendant says that this release bars plaintiff's claim.

This defense cannot be sustained for two reasons:

1. Since this is a proceeding for review of an agency appeals board decision, and such review can be made only on the basis of the board record, United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), the court cannot receive or consider new evidence on an issue that was never presented to or considered by the Board. Northbridge Electronics, Inc. v.

United States, 444 F.2d 1124, 1130, 195 Ct.Cl. 453, 463 (1971).[27]

2. In any event, the release on its face excepts plaintiff's "claim arising from failure to provide right-of-way as per original contract * * *." Clearly, this exception preserves the claim. Defendant's contention that the wording of the exception fails to preserve plaintiff's claim rests upon its basic position that, as the Board held, no provision of the contract entitles plaintiff to any relief. The argument is that the release only preserved a claim "as per original contract"; that plaintiff had no such claim under the contract; that the only claim plaintiff had was for one outside the contract, *i. e.,* a "breach of contract"; and that the release was therefore defective in preserving such a breach claim. Defendant's basic position on this point has already been dealt with and rejected.

### IV

On the basis of the considerations hereinabove set forth plaintiff is, by grant of its cross-motion for summary judgment, entitled to recover, such recovery to be measured by an appropriate equitable adjustment under Changes Article 3 of the General Provisions of the contract. On remand to the Interior Board of Contract Appeals pursuant to Pub.L. 92–415, 86 Stat. 652, and the court's General Order #3 of 1972 implementing such statute, the amount of the equitable adjustment due plaintiff is to be determined by the Board.

27. Defendant was the first moving party in this case, characterizing its motion as one made under the court's summary judgment Rule 101 to dismiss the petition on the grounds that plaintiff's claim was barred by the statute of limitations. On plaintiff's motion for an extension of time to file a cross-motion under the court's Wunderlich Act Review rules (Rules 161 et seq.), the court referred the case to the trial judge "to determine whether defendant's motion for summary judgment should be considered as having been appropriately filed under Rule 101 for action prior to consideration of Wunderlich Act issues or whether defendant's said motion should be considered as filed under Rule 163 for proceedings under

Wunderlich Act review * * *." By order of July 6, 1972, the trial judge, pointing out that defendant's position depended upon upholding the Board's decision that plaintiff was not entitled to relief under the contract; that defendant's motion was in fact addressed to upholding that position; and that, in accordance with Wunderlich Act review procedures, defendant had, together with its answer, filed the administrative record consisting of 10 volumes, including the testimony before the Board, ruled that defendant's motion be considered as one filed under the Wunderlich Act Review rules. Neither party sought review of the trial judge's ruling.