**SUMMIT TIMBER COMPANY**

v.

**The UNITED STATES.**

No. 345–78.

United States Court of Claims.

April 21, 1982.

---

**3.** *Paul E. Lehman, Inc. v. United States, supra* note 1, at 356.

James P. Hunter, Everett, Wash., attorney of record, for plaintiff.

Perry E. Wallace, Jr., Washington, D. C, with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant. Robert Maynard, of counsel.

Before NICHOLS, KASHIWA and NIES,* Judges.

## OPINION

PER CURIAM:

 This case comes before the court on defendant's exception to the recommended decision of Trial Judge Harry E. Wood, filed January 14, 1981, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision with slight modification, as hereinafter set forth,** it hereby adopts the decision as the basis for its judgment in this case. Therefore it is concluded that plaintiff is entitled to recover and judgment is entered to that effect with

---

\* Judge, United States Court of Customs and Patent Appeals, sitting by designation.

\*\* Although the court adopts the trial judge's separate findings of fact, which are set forth in

his report, they are not printed herein. Also in view of the disposition herein, plaintiff's motion for judgment, filed April 7, 1981, is deemed to be moot.

further proceedings to be had pursuant to Rule 131(c) to determine the amount of recovery.

## OPINION OF TRIAL JUDGE

WOOD, Trial Judge: In this action, plaintiff sues to recover damages for alleged breach of a 1972 timber sale contract ("Contract 01561-5", or "the Boundary Sale") between plaintiff and defendant, acting through the United States Forest Service, Department of Agriculture.

Pursuant to Contract 01561-5, the Forest Service agreed to sell, and plaintiff agreed to purchase, cut and remove, "included timber" from (inter alia) two clearcutting units, one wholly within and one partly within Section 20, Range 34 North, Township 9 East, Willamette Meridian. Section 20 was within the Mount Baker-Snoqualmie National Forest. The northern boundary line of Section 20 was also the northern boundary line of the National Forest.

Section 17, the southern half of which plaintiff had owned since about 1956, was directly north of, and abutted the northern boundary of, Section 20. In marking on the ground the purported northern boundary of Section 20, the Forest Service used a "false corner" some 180 feet north of the true northeastern corner of Section 20 as a reference point, and marked a "false blaze line" proceeding west from the false corner, and some 180 to 200 or more feet north of the true section line between Sections 17 and 20, as the purported boundary. As a result of these errors, the northern boundary of the Boundary Sale, as marked on the ground by the Forest Service, was on plaintiff's own land and on adjoining land belonging to the State of Washington, and a certain amount of plaintiff's own timber was cut, removed, and paid for by plaintiff pursuant to the terms of Contract 01561-5.

In 1976, long after the Forest Service had closed its records on the Boundary Sale, an employee of the Washington State Department of Natural Resources notified both plaintiff and the Forest Service that he had discovered the true northeastern corner of Section 20, some 180 feet south of the "false corner." Since the Forest Service's "false blaze line" had proceeded west from the "false corner", it thus became apparent to both plaintiff and the Forest Service that the northern boundary of the Boundary Sale area as marked on the ground by the Forest Service was north of the true boundary line, on plaintiff's land.

In November 1976, plaintiff submitted to the Forest Service a claim for the "value of the stumpage of Summit Timber Company included within the Boundary Timber sale * * *", in the amount of $225,087.85. In September 1977, the Forest Service advised plaintiff it had "erroneously collected $48,-251.85 stumpage for timber collected on [plaintiff's] land", and the latter amount (less $1,352.40, the Forest Service's cost of replanting the cut area on plaintiff's land) was ultimately paid to plaintiff. The balance of plaintiff's claim was not paid, however, and in 1978 plaintiff filed suit in this court.[1]

Under the terms of Contract 01561-5, plaintiff was precluded from exporting any of the Boundary Sale timber. Due to the erroneous boundary designation on the ground, that restriction was applied to plaintiff's own timber erroneously included as part of the Boundary Sale. More specifically, plaintiff's own timber from the area erroneously included within the Boundary Sale area was sold by plaintiff only on the domestic market.

At or around the time here relevant, the reasonable export market value of timber was greater than the reasonable domestic market value of timber of the same species and grade. Plaintiff contends that the Forest Service's erroneous representations in the contract documents, and its erroneous marking of the Boundary Sale area on the ground, amount to a breach of contract; that but for the breach plaintiff could have

---

1. Trial of the case was duly limited to the issues of law and fact relating to plaintiff's right to recover, reserving determination of the amount of recovery, if any, for further proceedings pursuant to Rule 131(c).

sold its timber on the export market for more than it actually received for such timber; and that plaintiff has accordingly been monetarily damaged by that breach.[2]

Although defendant readily admits that the Forest Service erred in marking on the ground the northern boundary of Section 20 and the cutting boundaries for the Boundary Sale, it nonetheless denies that plaintiff has any right to recover. The arguments upon which that denial rests are detailed in Section II, *infra*, and will not be set forth at this point.

For the reasons hereinafter appearing, it is concluded that plaintiff is entitled to recover. Determination of the amount of such recovery is reserved for further proceedings pursuant to Rule 131(c).

I

The Boundary Sale was awarded to plaintiff, as the highest bidder, following public advertisement, the issuance of a prospectus, and the preparation by the Forest Service of a sample timber sale contract. A Sale Area Map was attached to the sample timber sale contract (if not to the prospectus itself), and an identical Sale Area Map was ultimately incorporated into Contract 01561–5.

The prospectus, and the Sale Area Map, plainly indicated to all prospective bidders a number of things. Among them were: (1) that the Forest Service was offering for sale government-owned timber located (insofar as here relevant) entirely in Section 20, and within the boundaries of the Mount Baker-Snoqualmie National Forest; (2) that within the contemplated sale area "Section corners [had been] located and Section lines [had been] blazed" by the Forest Service; and (3) that the boundaries of the proposed

sale area in general, and of the two clear-cutting units here relevant in particular, had been determined and accurately "Marked [on the ground by the Forest Service] prior to Advertising".

Contract 01561–5, awarded to plaintiff March 24, 1972, reiterated, and expanded upon, those representations. Among other things, that contract stated that the sale area was located in Section 20 (and Sections 21 and 22, also owned by the United States); that the boundaries of the clear-cutting units specified in the contract had been "plainly marked on ground [by the Forest Service] before sale advertisement"; that "the boundaries of 'Sale Area' and any subdivision thereof" were as shown on an attached Sale Area Map;[3] and that those boundaries had been, "before sale advertisement, designated on the ground by Forest Service * * *."

In light of the contract language just summarized, the provisions of the Sale Area Map, the inclusion on that map of "Protect Known Survey Monument" symbols, and a contractual requirement that the Forest Service designate on the ground all known survey monuments, section corners, and other corner accessories, the Forest Service plainly and explicitly represented to plaintiff in the contract that it had located the true section corner between Sections 16, 17, 20, and 21, as well as a quarter corner[4] on the southern boundary of Section 17, and that it had accurately marked on the ground both the section line between Sections 17 and 20 and the boundaries of the two clearcutting units here relevant.

In fact, the Forest Service had *not* located the true section corner between Sections 16, 17, 20, and 21; it had *not* determined and accurately marked on the ground either the true section line between Section 20,

---

**2.** Plaintiff concedes that defendant is entitled to offset against any sums due plaintiff the amount defendant refunded to plaintiff following the 1976 discovery of the error in marking the Boundary Sale area on the ground.

**3.** The Sale Area Map depicted, among other things, the section corner between Sections 16, 17, 20, and 21; the boundaries of the Boundary Sale area; the boundaries of the clearcutting

units; and the National Forest boundary. According to the Sale Area Map, all designated boundaries were within the Mount Baker-Snoqualmie National Forest.

**4.** This quarter corner was designated on the map as being at or near the midpoint of Section 17's southern (and Section 20's northern) boundary.

owned by defendant, and Section 17, the south half of which plaintiff owned, or accurate boundaries for the clearcutting units here relevant; it had *not* blazed an accurate "section line", but instead had marked a "false blaze line" on and across Section 17; it had *not* located the true quarter corner on the southern boundary of Section 17; and, it had included within the sale area as marked on the ground timber not within the Mount Baker-Snoqualmie National Forest, and not owned by defendant.

## II

In opposing plaintiff's claim that defendant's erroneous contract representations and its erroneous marking of the sale area on the ground constitute a breach of contract entitling plaintiff to recover, defendant makes three broad arguments: (1) that "there was no breach of contract by defendant"; (2) that plaintiff "has not proved its claim based on misrepresentation"; and (3) that the parties "made a mutual mistake of fact", that "plaintiff assumed the risk of its mistake", and that in any event "plaintiff is not entitled to relief".

## A

Defendant bases its broad denial of any breach of contract on a number of propositions. None of them has any validity.

First, defendant says that "actions taken before there is a contractual relationship between the parties do not constitute a breach of contract", that its error in marking on the ground the erroneous section line between Sections 17 and 20 occurred at a time when "there was no contract in existence to be breached", and that "accordingly no breach could have occurred."

This is sheer sophistry. Contract 01561–5 contained positive, but erroneous, representations upon which plaintiff in fact relied in bidding on, entering into and performing, the said contract.[5] That those erroneous "positive representations" were that defendant had taken certain actions prior to contract formation (parenthetically, a not

unusual situation) is plainly no defense to an action for breach of contract based upon misrepresentation. *Morrison-Knudsen Co. v. United States*, 170 Ct.Cl. 712, 718, 345 F.2d 535, 539 (1965); *see also Flippin Materials Co. v. United States*, 160 Ct.Cl. 357, 365, 312 F.2d 408, 413 (1963). Where a contract explicitly represents that defendant has accurately performed an act essential to contract performance, it may not avoid responsibility for its failure to have done so merely because the failure accurately to perform that act antedated actual contract formation. *Ibid.*

Second, defendant asserts that the contract provisions respecting the marking of boundaries simply provided "basic helpful information concerning the sale", that defendant had "no duty under the contract to mark the Boundary Sale boundaries", and that the contract contained no promises, and created no duties, with respect to the marking of such boundaries. Simple reference to the provisions of Contract 01561–5 establishes that this line of argument is wholly untenable. *Cf.* Restatement of the Law of Contracts, §§ 260, comment c, 314, comment b (1932).

Defendant also contends alternatively that even should Contract 01561–5 be held to create a "duty upon the Forest Service to lay out boundaries", the Forest Service "performed properly under the contract, and * * * in a reasonable * * *" (albeit admittedly erroneous) manner. As a result, defendant says, there was no breach of contract.

*Timber Investors, Inc. v. United States*, 218 Ct.Cl. 408, 587 F.2d 472 (1978), cited by defendant as authority for the proposition that reasonableness is a defense here, does not justify it. The facts of that case differ sharply from this one. Whether or not a reasonable, but erroneous, estimate amounts to a breach of contract, the gravamen of this case is not an erroneous estimate, but rather erroneous factual representations that certain boundaries had been located and accurately marked on the ground.

---

**5.** Defendant's contention that such reliance was not justified is considered hereinafter.

A positive, but erroneous, representation in a contract is not rendered innocuous simply because it was due to mere negligence or inadvertence, rather than to bad faith or gross error: "* * * the lack of * * * a 'sinister purpose' is immaterial." *Morrison-Knudsen Co. v. United States, supra*, 170 Ct.Cl. at 719, 345 F.2d at 539. *See also Everett Plywood & Door Corp. v. United States*, 190 Ct.Cl. 80, 92, 419 F.2d 425, 431 (1969). The alleged reasonableness *vel non* of defendant's error is wholly irrelevant here. *Ibid.*

In denying any breach of contract, defendant also urges that it "marked the boundary on the ground as stated in the contract", that it "fully performed all duties actually created under the Boundary Sale contract", and that it therefore committed no breach. The short answer is that these contentions founder on the facts.

The government's argument that the propositions just noted establish the absence of any breach of contract must be, and is, rejected.

**B**

Absent some valid basis for a contrary conclusion (*e.g.*, an absence of detrimental reliance by a government contractor, a failure to investigate "sources which would have revealed the truth," or the like), the government "is liable for damage attributable to misstatements of fact (in a contract or specifications) which are representations made to the contractor." *Flippin Materials Co. v. United States, supra*, 160 Ct.Cl. at 365, 312 F.2d at 413 (1963). *See also Everett Plywood & Door Corp. v. United States, supra; Morrison-Knudsen Co. v. United States, supra; Womack v. United States*, 182 Ct.Cl. 399, 411–12, 389 F.2d 793, 800 (1968).

Defendant contends that plaintiff's reliance upon the boundaries of the Boundary Sale, as marked on the ground by the Forest Service, was not justified; that defendant acted reasonably (if erroneously) in

marking those boundaries on the ground; that this being a "case * * * of mutual mistake", a "claim of misrepresentation will not lie"; and that plaintiff has thus "not proved its claim based on misrepresentation." These arguments require some further explication of the facts.

For perhaps as many as 50 years prior to the Boundary Sale, a blaze line (a line of trees, marked by blazes or notches) had been in existence in the vicinity of Sections 17 and 20. That blaze line, which ran both east and west from what ultimately proved to be the false corner between Sections 16, 17, 20, and 21, appeared to mark the boundary between Sections 17 and 20, but in fact did not do so.

Prior to the advertisement of the Boundary Sale, and the marking of that sale on the ground, the supposed boundary line between Sections 17 and 20 was marked by metal tags which indicated, in essence, that the blaze line was the boundary of the Mount Baker-Snoqualmie National Forest.[6] In fact, that blaze line was some 180 to 200 or more feet north of the true section line between Sections 17 and 20, on (and across) Section 17.

In the summer of 1971, two Forest Service employees marked the boundaries for the Boundary sale. These employees started at the mid-point of the southern boundary of Section 16 (and the northern boundary of abutting Section 21 to the south). They then proceeded in a generally westerly direction along the blazed line of trees. That blaze line (the false blaze line) led them to the false corner between Sections 16, 17, 20, and 21, where they found a squared stake with two ribbons on it. The false blaze line intersected the squared stake, and then proceeded west on (and across) Section 17.

The Forest Service employees used the false corner, and the false blaze line, in marking on the ground the northern limits of the cutting boundaries for the Boundary Sale.[7] They marked the cutting boundaries

---

**6.** The metal tags had been in place so long that they were overgrown with tree bark.

**7.** The Forest Service did not survey the northern boundary of Section 20, nor did plaintiff.

with yellow ribbons tied around branches and small trees (or stapled on trees), and yellow cutting boundary signs, some of cardboard and some of aluminum. Because of the Forest Service's errors (1) a certain portion of plaintiff's own timber was included in the proposed Boundary Sale area as marked on the ground, and (2) plaintiff, as successful bidder on that sale, cut, removed, and paid the Forest Service for, some of its own timber.

It is crystal clear that Contract 01561–5 erroneously represented that the purported "boundary" between Sections 17 and 20 had been accurately determined and marked on the ground. It is equally clear that in bidding upon, entering into, and performing Contract 01561–5, plaintiff in fact relied upon that purported "boundary". On this record, defendant's contention that that reliance was unreasonable and unjustified has no merit.

The contention has as its basis several undisputed facts: (1) that the "boundary" erroneously marked on the ground by the Forest Service was supposedly the southern boundary of plaintiff's own property; (2) that at some time prior to July 1971, Mr. Richard Gilbert, one of plaintiff's employees, had had some personal doubt whether the false corner subsequently used by the Forest Service as a reference point in marking the boundaries of the Boundary Sale was the true corner between Sections 16, 17, 20, and 21; (3) that prior to bidding on Contract 01561–5, plaintiff's president had inspected the Boundary Sale area; and (4) that in 1973 and 1974, plaintiff cut its own timber on the southern half of Section 17 to the Forest Service's markings on the ground. These facts do not, however, justify the conclusion that plaintiff's reliance upon defendant's misrepresentation was either unreasonable or unjustified.

Mr. Gilbert was not attempting to fix the boundary of plaintiff's property when he found the apparent section corner in question prior to mid-1971. His concern at that time was designing a road. Although the apparent section corner "just didn't look exactly right" to him, he felt that use of the apparent section corner was good enough for his purposes, and he proceeded with his road design using that apparent section corner as a reference point.

Any doubt Mr. Gilbert may have had about the accuracy of the apparent section corner disappeared, and reasonably so, when he subsequently became aware that the Forest Service had used that same corner as a reference point in marking the boundaries of the Boundary Sale. Plaintiff's reliance upon the Forest Service's boundary markings cannot validly be faulted because of Mr. Gilbert's earlier passing doubt. This is clearly an insufficient basis from which to conclude that plaintiff knew or should have known of the Forest Service's error in determining and marking the boundaries for the Boundary Sale.

The coincidence of the northern boundary of Section 20, owned by defendant, with the southern boundary of Section 17, the south half of which was owned by plaintiff, does not lead to any different result. Whether or not defendant is right in suggesting that plaintiff should have known the boundary of its own property,[8] defendant's obligation in this respect was even greater. *Cf. McKee v. United States*, 205 Ct.Cl. 303, 324, 500 F.2d 525, 536 (1974). Defendant had established and marked on the ground boundaries for a timber sale, to be awarded to the successful bidder, whoever that bidder might be, and it had affirmatively represented those boundaries to be accurate ones. *Ibid.*

" * * * [U]nder the circumstances of timber sale contracts, it would not seem reasonable to require plaintiff * * * to conduct * * * " its own independent investigation "to ascertain the accuracy or inaccuracy of the Forest Service * * * " representations. *Timber Investors, Inc. v. United*

---

8. It was standard industry, and Forest Service, policy to locate a corner and follow existing blaze lines in marking timber sale boundaries. Defendant's argument that it acted reasonably in fixing the boundaries for Contract 01561–5 considerably weakens its charge that plaintiff should have known more about those boundaries than defendant did.

*States, supra.* Plaintiff's failure to realize that defendant had erred in marking on the ground the boundaries for the Boundary Sale was not unreasonable or unjustified simply because there was a common boundary between plaintiff's and defendant's property.

The pre-bid visit of plaintiff's president to the proposed Boundary Sale area was for the purpose of investigating the grade and volume of timber available pursuant to the proposed sale, not to check whether the Forest Service had accurately marked the boundaries of its own property in offering that timber to any interested bidder. That visit also fails to serve as a ground for excusing defendant from the consequences of its error.

Finally, in using the false blaze line as the cutting boundary for a 1973 sale of its own timber, plaintiff simply continued to rely, and again reasonably so, on the Forest Service's earlier representations. Plaintiff had no reason at the time to doubt those representations, nor can it properly be concluded that at any time here relevant plaintiff should have known them to be erroneous.

In the circumstances, the argument that plaintiff's reliance upon defendant's misrepresentations was neither reasonable nor justified is untenable.

### C

Still to be considered are defendant's arguments that the parties made a mutual mistake, that plaintiff assumed the risk of that mistake, and that in any event plaintiff is not entitled to any relief. Those arguments also fail.

In a very real sense, both parties to a contract which contains a misrepresentation can, absent unusual circumstances, be described as having a mutual "state of mind that is not in accord with the facts". Restatement of the Law of Contracts, § 471, comment h (1932). *Cf.* I Nash & Cibinic, Federal Procurement Law, 149 (3d ed. 1977). Conscious deception, a misrepresentation which fails to mislead as to the true facts, or the like, may prevent mutuality, of

course, but in the facts and circumstances of this case no valid exception to the broad proposition just stated is suggested, or appears.

In this case, however, there is "no reason to believe, or to hold * * *", that Contract 01561–5 "was mistakenly drawn." *Jamsar, Inc. v. United States,* 194 Ct.Cl. 819, 829, 442 F.2d 930, 935 (1971). "Here there can be no doubt that the written contract precisely expressed the terms and conditions upon which both parties had agreed * * *." *Evans Reamer & Machine Co. v. United States,* 181 Ct.Cl. 539, 551, 386 F.2d 873, 880 (1967), *cert. denied,* 390 U.S. 982, 88 S.Ct. 1102, 19 L.Ed.2d 1279 (1968).

The precise problem here is not that the contract was at variance with the intent of the parties to it, but that a material, and witting, representation contained in that contract and reasonably relied upon by plaintiff was erroneous. Although neither defendant nor plaintiff realized that the contract embodied that misrepresentation until long after it had been performed, that fact does not transform a claim to damages for breach by misrepresentation into one for purely equitable relief for mutual mistake.

Put another way, where one party to a prospective contract makes a positive but erroneous representation of a material fact, and another party innocently and reasonably relies upon that representation in entering into and performing the contract, the power of a court to grant redress to the aggrieved party is not, as defendant contends, limited to traditional remedies for mutual mistake. *Everett Plywood & Door Corp. v. United States, supra; Morrison-Knudsen Co. v. United States, supra; cf. Gevyn Constr. Co. v. United States,* 357 F.Supp. 18 (S.D.N.Y.1972).

Defendant's further assertion that because the boundary of plaintiff's own property was involved plaintiff assumed the risk of any Forest Service mistake in marking boundaries on the ground is patently fallacious. And, *Rash v. United States,* 175 Ct.Cl. 797, 360 F.2d 940 (1966), cited by

defendant in support of its mutual mistake argument, is sharply distinguishable. That case did not involve a misrepresentation, but rather a mutual mistake in its traditional sense. It is of no comfort to defendant here.

Defendant's "mutual mistake" defense is invalid. Plaintiff is entitled to recover "damages caused by the incorrectness of [defendant's] representations * * *." *Everett Plywood & Door Corp. v. United States, supra*; see also *Womack v. United States, supra*, 182 Ct.Cl. at 411–12, 389 F.2d at 800.

## CONCLUSION OF LAW

Upon the trial judge's findings which are set forth in his report and foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. Absent a stipulation of the parties as to the amount of recovery due plaintiff, that amount is to be determined in further proceedings pursuant to Rule 131(c).